2023 IL App (2d) 220176
No. 2-22-0176
Opinion filed September 12, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-516 |
| JUAN C. AVENDANO, | ) ) ) | Honorable Salvatore LoPiccolo Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1　Following a jury trial, the defendant, Juan C. Avendano, was convicted of three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)). On appeal, the defendant argues that two of those convictions should be vacated based on one-act, one-crime principles or, alternatively, that the indictments were multiplicitous and deprived him of his due process right to be protected from double jeopardy. The defendant also argues that evidentiary errors and inequitable decisions by the trial court denied him a fair trial. We affirm.

¶ 2　　　　　　　　　　　　　　I. BACKGROUND

¶ 3　In 2018, the defendant was charged with three counts of predatory criminal sexual assault of a child (*id.*), three counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)), and one

count of indecent solicitation of a child (*id.* § 11-6(a)). In relevant part, each of the counts for predatory criminal sexual assault alleged that, on or about January 1, 2016, through December 31, 2017, the

> "defendant, a person seventeen years of age or over, knowingly committed an act of sexual contact with L.R., a child under the age of thirteen years when the act was committed, in that the defendant touched the sex organ of L.R. with his hand for the purpose of the sexual arousal of the defendant."

¶ 4 Prior to trial, the trial court granted the State's motion *in limine* to introduce the out-of-court statements made by the victim, L.R. The trial court also granted the State's request to introduce, as other crimes evidence, allegations made against the defendant in 2014 by A.A. The trial court barred the defense from mentioning the State's decision not to bring charges against the defendant in 2014 based on A.A.'s allegations.

¶ 5 A jury trial commenced on August 17, 2021. In opening statements, the State explained that the defendant was charged with three counts of predatory criminal sexual assault and three counts of aggravated criminal sexual abuse and that all those counts pertained to the same type of act—"the touching in the pants." The State also stated:

> "To be frank, the number three is somewhat of an arbitrary number because you'll hear that the evidence from [L.R.] in her interview and what I expect her to say on the stand is that it happened a lot of times. It happened what seemed to her like every day.
>
> So I expect that the evidence will show that we have proven at the end of this case that it happened—that we have proven three counts of predatory criminal sexual assault and three counts of aggravated criminal sexual abuse."

¶ 6    Timothy Bosshart, an investigator with the Kane County Child Advocacy Center (CAC), testified that, in 2018, he was assigned to a case involving the defendant. He reviewed enrollment records from Bardwell Elementary school (Bardwell), which showed that L.R. attended kindergarten at Bardwell from August 2016 to June 2017 and that A.A. attended kindergarten at Bardwell from August 2014 to January 2015.

¶ 7    Perla Cruz testified that she was 10 years old. She and L.R. had been in the same first grade classroom at Bardwell and were friends with another student named Samantha Villa. During that school year, L.R. told Cruz and Villa that a teacher was touching her private parts. L.R. did not say what teacher was touching her. After that, Cruz told their first grade teacher, Elizabeth Aguilar, what L.R. had said. On cross-examination, Cruz admitted that L.R. told her this after they had been talking about boys.

¶ 8    Twyla Garza testified that she had been the principal at Bardwell from 2014 to 2019. The defendant had been a kindergarten teacher at Bardwell from 2014 to March 2018. During the 2014-15 school year, a student named A.A. was in the defendant's classroom. Garza testified that she observed the defendant in his classroom during that school year. While the defendant typically assessed students in groups of four or five at a U-shaped green table, she acknowledged that he could have assessed students individually. Garza recalled that A.A. transferred to another school in January 2015, based on her mother's request. On cross-examination, Garza testified that she never saw the defendant alone in the classroom with only one student.

¶ 9    Officer Joseph Salinas testified that he worked for the Aurora Police Department. On March 7, 2018, he responded to L.R.'s residence at 6:30 in the evening. He and another officer spoke to L.R.'s mother, M.R., in Spanish. L.R. was also present. M.R. was upset, sad, shocked, and in disbelief over what L.R. had said about the defendant. After their conversation, Salinas

called the Department of Children and Family Services (DCFS) because he was a mandated reporter. On cross-examination, Salinas testified that, during the conversation, M.R. was explaining what happened and L.R. was listening to her mom explain things.

¶ 10    L.R. testified that she was 10 years old and was starting fifth grade the next day. The defendant was her kindergarten teacher. She testified that, in kindergarten, the defendant "always was touching me, like my private part." She said it happened "more than one time" and "[e]very time I was in school." It would happen when she was at the green table for reading instruction and they were the only ones sitting at the table together. The defendant would touch her with his hand under her clothes where she goes pee. He would ask her to go to the reading table alone with him every day, and he would touch her every time. When asked where on her body he would touch her and shown a diagram, L.R. circled the vagina. She said it made her uncomfortable and angry. He would move his hand while touching her and would smell his hand when he was done. L.R. testified that once the defendant took her into a closet and asked her to kiss him on the mouth but she refused. L.R. testified that she did not know why she never told her mother.

¶ 11    On cross-examination, L.R. acknowledged that she spoke to a lot of people about the abuse. Her first grade teacher was Miss Aguilar. L.R. did not like Miss Aguilar because she was mean. The trial court sustained objections when L.R. was asked why she thought Miss Aguilar was mean and if L.R. would often get in trouble in school. At a sidebar, defense counsel explained that the defendant's theory of the case was that L.R. was not telling the truth and counsel was trying to show that, in kindergarten and first grade, L.R. was a troublemaker and known to tell lies. The trial court allowed defense counsel to lay a foundation for impeachment. Testimony resumed, and L.R. testified that when she misbehaved at school she would sometimes sit at a table alone, far from the other students. This was because she would never listen to the teacher. L.R. testified that, in first

grade, she told Cruz that the defendant always touched her in kindergarten. L.R. did not remember talking to Miss Aguilar and denying that she said anything to Cruz about being touched in kindergarten. L.R. did not remember if her mother punished her when she misbehaved in kindergarten and first grade. L.R. did not remember her mother telling her that she would "pay for it" if she was not telling the truth. L.R. acknowledged that, on the day she told Cruz about the defendant touching her, Miss Aguilar had caught them talking about boys. The trial court sustained objections when defense counsel tried to ask L.R. if there was a boy in kindergarten that would kneel down and kiss her private part in school.

¶ 12    M.R. testified that the defendant was L.R.'s kindergarten teacher. On March 7, 2018, when L.R. was in first grade, M.R. went to pick her up from school. The teacher, Miss Aguilar, had a private conversation with M.R. and told her that L.R. had been saying that the defendant touched her vagina. Miss Aguilar told M.R. that L.R. was lying. When M.R. was in the car driving home with L.R., she asked L.R. if what she had been saying about the defendant touching her was the truth or a lie. L.R. told her it was the truth. L.R. told her that the defendant put his hands in her underwear and in her private part. L.R. told her that this happened at the green table and that there was a door that the defendant would open so that other students could not see what he was doing. L.R. was crying. M.R. further testified that once they were at home they had another conversation in the kitchen. L.R. repeated that she was telling the truth. L.R. said that she did not tell M.R. sooner because the defendant told her that it was their secret and she did not want to cause M.R. any problems. M.R. called the police and two officers arrived. The next day, M.R. took L.R. to the CAC.

¶ 13    On cross-examination, M.R. acknowledged that Miss Aguilar had told her during the March 2018 conversation to make sure that L.R. was telling the truth. Miss Aguilar said that, when

she first confronted L.R. about it, L.R. told her that it was not true. M.R. never told L.R. that "she would pay for it" if she was not telling the truth. M.R. acknowledged that the defendant would call her when L.R. misbehaved at school and that she would punish L.R. for her bad conduct. M.R. testified that L.R. does not lie to her. M.R. acknowledged that L.R. told her that the defendant touched her "many times" but L.R. did not say that it happened every day when she went to school. Although she initially denied it, M.R. ultimately acknowledged that Miss Aguilar told her that, prior to Cruz informing Miss Aguilar of the alleged abuse, Miss Aguilar caught L.R., Cruz, and Villa talking about love and sex.

¶ 14    Shannon Krueger testified that she was a pediatric nurse practitioner with specialized training related to child sexual abuse. She examined L.R. on March 13, 2018. M.R. was also present for the exam. M.R. informed Krueger that L.R. often had vaginal rashes and suffered nightmares in kindergarten. Krueger testified that rashes and nightmares can be consistent with child sexual abuse. Krueger examined L.R. from head to toe, and the exam was normal. If disclosures of sex abuse were delayed, as in L.R.'s case, it would not be unusual to have a normal exam. On cross-examination, Krueger acknowledged that she did not know if L.R. was abused and that there were other explanations for vaginal rashes and nightmares. Krueger testified that M.R. told her that L.R. had behavior issues in kindergarten but did not have any behavior issues in first grade.

¶ 15    A.A. testified that she was 12 years old and in seventh grade. She went to Bardwell for kindergarten, and the defendant was her teacher. A.A. testified that she was sexually abused by the defendant in the classroom. It happened at a round green desk when she was reading a book with the defendant. They were both sitting on chairs at the table, and the defendant was right next to her. They were sitting with their backs to the rest of the classroom. He would put his hand down

her pants and move his fingers around on her vagina. His fingers would also go inside of her vagina. She did not tell anyone right away because she was scared. She could not remember if it happened just one time or more than one time.

¶ 16    On cross-examination, A.A. testified that, when she was in kindergarten, her mom would ask her multiple times a day if anyone was touching her. Her mother would tell her to not let anyone touch her. Her mom's questions were uncomfortable and annoying. A.A. testified that the defendant touched her shoulders and her vagina. A.A. remembered talking to Garza in October 2014. When Garza asked A.A. to show her how the defendant touched her, A.A. patted Garza on the back and the shoulder.

¶ 17    A.A. testified that one day, late at night, her mom was asking her if anyone was touching her. At first, she said no, but her mom kept asking. Her mom said "let's tell God" if someone is touching you. A.A. still denied that she was being touched. Her mom then offered her favorite candy and said A.A. could not have it unless A.A. said that someone was touching her. A.A. did not remember telling her mom that someone with the initial "A" had touched her. A.A. denied laughing when her mom was asking her these questions. Eventually, her mom grabbed her butt and asked if A.A. was touched like that. A.A. said yes. This was the first time A.A. admitted that she had been touched inappropriately.

¶ 18    Orlando Arroyo testified that he investigated reports of child abuse and neglect for DCFS. He interviewed L.R. at the CAC on March 8, 2018. The interview was in Spanish. L.R. told him that the defendant was her teacher the previous school year, and she described him as "nasty." When Arroyo asked why the defendant was nasty, L.R. said it was because he had touched her private part. When shown an anatomical diagram, L.R. circled the vagina and the butt as the places where she was touched. A recording and a transcript of Arroyo's interview with L.R., which was

in English, was admitted into evidence. Arroyo reviewed the recording and the transcript and testified to their accuracy. The recording was played for the jury, and the jury followed along with the transcript. In the interview, L.R. indicated that the defendant would touch her private part from the vagina to the buttocks and he would put his finger in her vagina. L.R. also indicated that, when the defendant was done touching her, he would smell his finger.

¶ 19    On cross-examination, Arroyo acknowledged that it is best to question a child victim as close in time to the abuse as possible. If there is a delay, details can be lost; further, the child can be influenced by conversations with parents or caretakers or by conversations overheard between adults, because children can repeat things that they overhear. Arroyo testified that he knew that L.R. had overheard conversations between M.R. and others about deciding whether to call the police and that she overheard her mother speaking with the police. Arroyo also acknowledged that he did not ask L.R. if she knew the difference between the truth and a lie.

¶ 20    The State rested and, following argument, the trial court denied the defendant's motion for a directed verdict. The defense called the following witnesses.

¶ 21    Elizabeth Aguilar testified that, in 2018, she had been teaching at Bardwell for about 19 years. She originally taught upper grade levels but in 2018 was teaching first grade. L.R. was her student and L.R. had difficulty adjusting to classroom routines. L.R. needed a lot of redirection and Aguilar often had to discipline L.R. throughout the year. On March 6, 2018, she overheard L.R., Cruz, and Villa talking about boyfriends and she heard the word "sex." She told them that such talk was not appropriate. The next day, Cruz told her that the defendant was L.R.'s boyfriend and that he touched L.R.'s private parts. L.R. approached Aguilar and told her that Cruz was lying and trying to get her in trouble. Aguilar asked L.R. whether the accusation was true. L.R. repeated that it was not true. On cross-examination, Aguilar acknowledged that L.R. never said the

accusation was not true. Rather, L.R. stated only that Cruz was lying and that she never told Cruz anything. On redirect, Aguilar acknowledged that she spoke to Garza a number of days after the incident. She told Garza that L.R. repeatedly denied that Cruz's statement was true.

¶ 22 M.M. testified that she was A.A.'s mother. M.M. did not ask A.A. every day whether someone was touching her, and M.M. denied ever telling that to any of the investigators. M.M. testified that one day in September 2014 she and A.A. were eating dinner and she had to get up to get a utensil. When she passed by A.A., she touched A.A.'s shoulder in a massaging motion. A.A. then said that her teacher touched her shoulder like that. When M.M. asked A.A. to show her how the teacher touched A.A., A.A. put her hands under M.M.'s shirt and massaged her shoulders. M.M. went to talk to Garza a few days later.

¶ 23 M.M. further testified that she did not ask A.A. again if someone was touching her until November 2014, when she sensed that A.A. was not doing well. One day, after she had given A.A. a bath, she asked A.A. if she was okay. M.M. denied telling anyone that she bathed A.A. at three in the morning or asked A.A. whether someone was touching her. When M.M. asked A.A. if she was okay, A.A. curled into a fetal position and started crying. She told A.A. that it was okay because God was with them. She told A.A. that they will tell God what happened. After A.A. told M.M. about the abuse, M.M. gave A.A. some candy. M.M. denied telling A.A. that she would give her candy if she said what happened. A.A. told her what happened before there was any mention of candy. M.M. asked A.A. if she knew the initial of the person who had touched her. A.A. said the abuser's initial was "A." She then asked A.A. to say the person's name. A.A. was crying so she had to wait for her to calm down. After a while, A.A. stated that it was "Mr. Avendano." After A.A. described how the defendant had touched her, M.M. called the police.

¶ 24   M.M. testified that A.A. demonstrated how the defendant touched her. A.A. put her hands in her underwear and then on her chest. M.M. denied grabbing A.A.'s buttocks and asking whether the defendant touched her like that. A.A. told M.M. that the defendant touched her while they were reading together. M.M. testified that the police came to her house about 20 minutes after she called. They then went to A.A.'s school together. M.M. acknowledged that she had a pending lawsuit against the school, the defendant, and Garza. She was seeking justice, not money, but admitted that the suit requested damages in excess of $50,000.

¶ 25   The parties stipulated that, if called, Officer Kubis of the Aurora Police Department would testify that he spoke with M.M. on November 24, 2014, at 11 a.m. at her home. M.M. said that she would ask A.A. several times every day if someone was touching her but A.A. would say no. M.M. told him that she was giving A.A. a shower at 3 a.m. that day and asked A.A. if anyone was touching her. A.A. did not answer. M.M. then told A.A. that we will tell God what happened, but A.A. still did not answer. M.M. then said that she told A.A. that she would give her some candy if she told her what happened. After that, A.A. told M.M. about the abuse.

¶ 26   Zoila Castro testified that she was a teaching assistant in the defendant's classroom during the 2014-15 school year. She would help the students read, take them to the bathroom, watch them in the cafeteria, and watch them outside. Castro testified that A.A. was smart and looked unkempt. A.A. would sometimes fall asleep, and she appeared bored in class. Castro testified that she never saw the defendant do anything inappropriate with the students and that the defendant was never alone in the classroom with just one student. If a student was with the defendant at the green reading table, Castro was always roaming around nearby. She never saw A.A. sitting right next to the defendant at the reading table. A.A. would be across the table from the defendant. There was a table right outside the classroom door and Castro would take students one-by-one to that table

for individual instruction. If Castro was in the hall, the defendant would not be able to do private instruction with someone at the green table. Castro explained, "It was not allowed. It was difficult due to the difficult group."

¶ 27 Melina Pantoja testified that, in 2014, she investigated a case involving A.A. for DCFS. In November 2014, she spoke with M.M. M.M. told her that A.A. first disclosed the alleged abuse after M.M. had given her a bath. M.M. asked A.A. if anyone was touching her inappropriately, and A.A. put her hands over her mouth and laughed "embarrassingly." M.M. said that she kept asking A.A. if anyone was touching her. When A.A. did not respond, M.M. told Pantoja that she told A.A. that they were going to talk to God. A.A. still said that no one was touching her. M.M. said that she then showed A.A. her favorite candy and asked A.A. if she wanted the candy. A.A. said yes, but M.M. told her that they had to talk first. M.M. told Pantoja that, at that point, A.A. told M.M. that the defendant had touched her. When M.M. asked A.A. where and how, A.A. pointed to her vagina and put her hands in her underwear. M.M. told Pantoja that she grabbed A.A.'s butt and caressed it and asked if this was how the defendant touched her. M.M. said that A.A. said no but that he "put his finger in." M.M. said that A.A. was laughing during the conversation.

¶ 28 Pantoja testified that, when she interviewed A.A., A.A. indicated that she was touched on her vagina, butt, shoulders, chest, belly button and back. A.A. said she was touched when she was at the green table with the defendant and the other students were at their desks. When Pantoja asked A.A. how she knew that the defendant touched her vagina, A.A. said that she did not know. A.A. also told Pantoja that the defendant's finger touched her butt and went in with a lot of force. When Pantoja asked how he could do that while A.A. was sitting, A.A. said that she did not know.

¶ 29    Garza testified for the defense that a teacher would never do one-on-one instruction in a kindergarten classroom if there was no assistant in the classroom, because it would result in chaos. Garza testified that the defendant was a peaceful person and she never saw him do anything inappropriate. In 2017, the green table was at the entrance door of the classroom all year up until about spring break. At that time, Garza moved the table towards the back of the classroom.

¶ 30    Claribel Marungo testified that she was a teaching assistant at Bardwell from 2016 to 2019. In 2016 and 2017, she was a bilingual kindergarten teaching assistant in the defendant's classroom. In the 2016-17 school year, the green table was originally near the door to the classroom and was moved sometime in April 2017. A student was at the green table only for reading lessons about once per week. L.R. was in the classroom during this school year. Marungo testified that L.R. was disruptive during class. L.R. would take things away from other students and come up with nonsensical ideas. When Marungo confronted L.R., L.R. would sometimes admit to her inappropriate behavior but other times she would deny it. L.R. was occasionally untruthful.

¶ 31    Marungo testified that she would occasionally leave the classroom for 20 to 25 minutes to help in a first grade classroom. The defendant would not do individual reading instruction at the green table during this time because there would be no one to watch the other students. The defendant did not call L.R. to the green table on a daily basis. When the defendant would meet with a student individually for testing at the green table, he would sit across from the student. She never had any concerns about the defendant's behavior and never saw the defendant touch a student inappropriately.

¶ 32    On cross-examination, Marungo admitted that there was a regular schedule for when she had to go help in the first grade classroom and that the defendant was aware of the schedule. The defendant would know when she was going to leave and when she would be back. The green table

was moved behind some waist high cabinets in March or April 2017. She acknowledged that the defendant would do guided reading/testing at the green table with one student at a time. At those times, she was watching the rest of the students on the other side of the cabinets. On redirect, Marungo testified that the cabinets were not tall and she could see the green table while she was walking around observing the rest of the students. There were no doors that could be closed to shut off her view of the area.

¶ 33    The defendant testified that he was 65 years old and came to the United States from Chile in 1984. He started teaching in the U.S. in 2002. In 2014, his teaching assistant was Castro and in 2017 it was Marungo. The assistants would help him take care of the students. He was never in the classroom alone with one student. He did not take individual students to the green table. When the teaching assistants left the room, he would not be able to take an individual student to the green table because the rest of the class would erupt in chaos.

¶ 34    The defendant further testified that he remembered A.A. She was a bright student, but her appearance was unkempt and she sometimes fell asleep. A.A. had behavioral issues, but she was a very good reader and there would have been no need to do individual reading instruction with her. The defendant testified that he never took A.A. to the green table for one-on-one instruction, never touched her shoulders under her clothes, never touched her butt, never put his hands in her underwear, never touched her private parts, and never sat right next to her at the green table.

¶ 35    The defendant acknowledged that L.R. was his student in the 2016-17 school year. That was the year the green table was moved behind the credenzas. L.R. was more difficult to deal with than other students. She would often get up and wander around the room or throw a tantrum on the floor. She had conflicts with other students, such as taking their crayons and breaking them. When he confronted her, she would often deny her behavior and be untruthful. The defendant

testified that he did not have L.R. at the green table every day and that it would be impossible for him to have done so. He never had L.R. at the green table for individual instruction because she was very bright. She was only at the green table in groups. The defendant testified that he never touched L.R. under her clothes, never touched her vagina, never touched her butt, and never touched her vagina and then smelled his hand.

¶ 36 After the defense rested, the trial court held a jury instruction conference. The defense objected to the verdict forms for predatory criminal sexual assault of a child because there was no distinction between them, such as by including the associated count numbers in the indictment. Rather, it was just three separate verdict forms that stated the defendant was guilty of predatory criminal sexual assault and three verdict forms that stated the defendant was not guilty of that offense. The defendant objected to the verdict forms for aggravated criminal sexual abuse for the same reason. The State argued that there was no distinction on the verdict forms because it was ongoing abuse and that this could be explained to the jury in closing. Over the defendant's objection, the trial court agreed to give the verdict forms without any differentiation.

¶ 37 In closing argument, the State, in asserting that it proved three counts of predatory criminal sexual assault, argued that L.R.'s testimony was true and that the assault "happened to her multiple times, meaning more than three times. If you believe what [L.R.] said, that's enough to find defendant guilty." In arguing that it proved three counts of aggravated criminal sexual abuse, the State argued that "[L.R.] also said the conduct happened multiple times, meaning more than three." Following closing arguments and deliberations, the jury found the defendant guilty of three counts of predatory criminal sexual assault and three counts of aggravated criminal sexual abuse. The jury found the defendant not guilty of indecent solicitation of a child.

¶ 38 After the trial court denied the defendant's motion for a new trial, the trial court held a sentencing hearing. The parties agreed that the three counts of aggravated criminal sexual abuse were lesser included alternative counts, convictions and sentences would not be entered on those counts, and they would merge into the three counts of predatory criminal sexual assault. The trial court sentenced the defendant to six years' imprisonment on each count of predatory criminal sexual assault, to be served consecutively. The defendant filed a timely notice of appeal.

¶ 39                                    II. ANALYSIS

¶ 40 On appeal, the defendant argues that two of his convictions of predatory criminal sexual assault of a child should be vacated under one-act, one-crime principles, he was deprived of his due process right to be protected from double jeopardy, and numerous evidentiary and trial court errors deprived him of a fair trial. We will address each argument in turn.

¶ 41                         A. One-Act, One-Crime Doctrine

¶ 42 The defendant's first contention is that two of his convictions of predatory criminal sexual assault of a child must be vacated under one-act, one-crime principles because the indictment, jury instructions, and verdict forms failed to notify the jury that they were being asked to decide separate acts to support multiple counts.

¶ 43 The defendant acknowledges that this issue has been forfeited because it was not raised in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.)). The defendant seeks review under the plain error doctrine.

> "[T]he plain error rule allows reviewing courts discretion to review forfeited errors under
> two alternative prongs: (1) when a clear or obvious error occurred and the evidence is so
> closely balanced that the error alone threatened to tip the scales of justice against the

defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

In order to successfully qualify for application of the plain error doctrine, a defendant must first show that the trial court committed a clear or obvious error. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 44 Alternatively, the defendant argues that his trial counsel was ineffective for failing to include this issue in his posttrial motion and thus failing to preserve the issue for appeal. To establish ineffective assistance of counsel, a defendant must demonstrate that his counsel's performance was fundamentally deficient and that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶ 45 The State concedes that the issue is not forfeited, as our supreme court has held that violations of the one-act, one-crime rule "fall within the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process." *People v. Coats*, 2018 IL 121926, ¶ 10. We thus address the defendant's argument under the second prong of the plain error doctrine. Under plain error review, we first determine whether any error occurred. *Herron*, 215 Ill. 2d at 187.

¶ 46 Under the one-act, one-crime rule, a defendant may not be convicted of more than one offense "carved from the same physical act." *People v. King*, 66 Ill. 2d 551, 566 (1977). In this context, "act" means "any overt or outward manifestation which will support a different offense."

*Id.* We first determine whether the defendant's conduct consisted of a single physical act or separate acts. *Coats*, 2018 IL 121926, ¶ 12. Multiple convictions are improper if they are based on precisely the same physical act. If, however, the defendant's conduct is based on more than one physical act, we proceed to the second step—determining whether any of the offenses are lesser included offenses. *Id.* If not, then multiple convictions are proper. *Id.* Whether a violation of the rule has occurred is a question of law, which we review *de novo*. *Id.*

¶ 47     The defendant argues that there is no way of knowing whether the jury concluded, based on L.R.'s testimony,  that the State proved a single act of touching, a hundred acts of touching, or some number in between, because the jury was free to credit some, all, or none of L.R.'s testimony. The defendant argues that the indictments did not differentiate between separate acts and the verdict forms were exactly the same and did not have any distinguishing factors such as different count numbers. Further, the defendant argues that the jury was never clearly advised that they were being asked to find three separate instances of abuse. The defendant argues, therefore, that there is no way to know whether the jury found him guilty of one act or multiple acts.

¶ 48     The defendant relies on *People v. Strawbridge*, 404 Ill. App. 3d 460 (2010). In *Strawbridge*, the defendant was charged with predatory criminal sexual assault of a child for placing his penis in the victim's vagina. The victim testified to numerous incidents of sexual contact with the defendant that started when she was nine years old and continued until a few months before her 13th birthday and occurred three or four times per week. *Id.* at 469. The victim described various sex acts, including intercourse and oral sex. *Id.* Count I of the indictment alleged that such conduct occurred between June 24, 1999, and March 20, 2000, whereas count II alleged that the conduct occurred on or about March 20, 2000. *Id.* at 462. He was convicted of both counts. *Id.* at 461-62.

¶ 49    This court vacated one of the defendant's convictions, holding that the multiple convictions violated one-act, one-crime principles. We noted that it was not possible to determine whether the jury found multiple instances of the charged conduct or whether the jury found one instance of the charged conduct yet found the defendant guilty on both counts because the one instance took place within the count I period but also happened to occur on or about the count II period. *Id.* at 463. In so ruling, this court noted:

> "The State points out that there is adequate evidence in the record to support convictions on multiple counts. We do not disagree; however, it is not our prerogative to place ourselves in the position of the jurors and try to determine how they arrived at their verdict. The problem here is that we cannot tell what the jury based its verdict on, and it is that verdict that is challenged on appeal. It is, after all, the jury that must convict the defendant."
>
> *Id.*

¶ 50    The defendant also relies on *People v. Crespo*, 203 Ill. 2d 335 (2001). In *Crespo*, the defendant stabbed the victim three times. *Id.* at 338. He argued on review that his aggravated battery conviction should be vacated because the charge stemmed from the same physical act that formed the basis of an armed violence charge (*id.* at 340). The State argued that the three different stabbings were separate and distinct acts, capable of independently sustaining each criminal conviction. *Id.* The supreme court held that, although each of the stab wounds could support a separate offense, the convictions of both aggravated battery and armed violence violated the one-act, one-crime doctrine because in the indictment the State had failed to apportion the offenses among the various stab wounds and, during closing arguments, the prosecutor had portrayed the defendant's conduct as a single attack. *Id.* at 342-44 ("the State specifically argued to the jury that the three stab wounds constituted great bodily harm," and it never argued that only one stab wound

would be sufficient to sustain the charge). The supreme court also noted that the State supported both the bodily harm requirement of aggravated battery and the great bodily harm requirement of armed violence by noting that the defendant stabbed the victim three times. *Id.* at 343.

¶ 51     *Strawbridge* and *Crespo* are distinguishable. *Strawbridge* involved separate overlapping periods, and it was not possible to determine whether the jury found the defendant guilty of one act—that fell within the timeframes specified in both counts—or two separate acts. In the present case, unlike in *Strawbridge*, there are no overlapping periods at issue. *Crespo* is distinguishable because the State supported convictions of different offenses with the same conduct—that the defendant stabbed the victim three times—and did not try to allot a separate stab to each offense. In this case, the State argued in its opening statement that there were three counts of predatory criminal sexual assault based on the same behavior of touching L.R. in the pants, that L.R. would testify that the conduct happened a lot of times and almost every day, and that this would prove three counts of predatory criminal sexual assault. In closing, the State again argued that L.R.'s testimony showed that the conduct happened multiple times, "meaning more than three times." The jury was thus aware that the three verdict forms required it to find that the conduct happened at least three separate times in order to return three guilty verdicts.

¶ 52     Our conclusion is supported by this court's decision in *People v. Foster*, 2022 IL App (2d) 210556-U. In *Foster*, the defendant was convicted of two counts of aggravated criminal sexual abuse. *Id.* ¶ 1. On appeal, the defendant argued that one of the counts should be vacated based on one-act, one-crime principles. *Id.* ¶ 106. He asserted that the State did not prove separate acts to support two convictions. He noted that both of the counts for aggravated criminal sexual abuse in the indictment were identical. He also argued that the jury instructions and the verdict forms did not distinguish between the two counts and that, therefore, the jury would still have convicted him

of both counts because it was never informed that the verdicts required findings of more than one act. *Id.* ¶ 109. This court rejected the defendant's argument. We explained that the victim testified that the defendant touched her more than one time. Further, during closing argument, the State noted that the defendant touched the victim's vagina " 'more than one time.' " *Id.* ¶ 112. We thus concluded that the "jury was informed that the State treated defendant's conduct as separate acts, [the victim's] testimony supported a finding of multiple acts, and defendant was on notice that the State sought to have him twice convicted of aggravated criminal sexual abuse." *Id.* ¶ 114.

¶ 53   The present case is similar to *Foster*. L.R. testified that the defendant touched her "more than one time" and "[e]very time [she] was in school." The indictment charged the defendant with three separate counts of predatory criminal sexual assault of a child and there were three verdict forms finding the defendant guilty of predatory criminal sexual assault. In its opening statement, the State noted L.R.'s testimony that the assault happened a lot of times and that it seemed like it happened every day she was in school, and the State argued that this was sufficient to prove three counts of predatory criminal sexual assault. In closing, the State again argued that the assault happened more than three times and that this was enough to find the defendant guilty of the charges of predatory criminal sexual assault. We note that the defendant never argued during closing that the State was required to prove three separate instances of assault but had failed in that regard. We conclude that, as in *Foster*, the indictment, the verdict forms, and the State's arguments sufficiently informed the jury that it needed to find the defendant guilty of three separate acts of predatory criminal sexual assault. Thus, there was no one-act, one-crime violation. Because there was no error, there can be no plain error. *Coats*, 2018 IL 121926, ¶ 32. In addition, because there was no error, the defendant cannot demonstrate that he suffered prejudice from trial counsel's alleged

deficient performance and his claim of ineffective assistance of counsel necessarily fails. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 54                                    B. Double Jeopardy

¶ 55    The defendant's second contention on appeal is that two of the three identical counts of predatory criminal sexual assault of a child and aggravated criminal sexual abuse must be vacated because the multiplicitous indictments deprived him of his due process right to be protected from double jeopardy. The defendant acknowledges that trial counsel did not preserve this issue for review but again argues that we can address the issue as a matter of plain error. As noted above, the first step in applying plain error review is to determine whether any error occurred. *Herron*, 215 Ill. 2d at 187.

¶ 56    The constitutional prohibition against double jeopardy bars three specific governmental actions, which are (1) prosecution for the identical offense after an acquittal, (2) prosecution for the identical offense after a conviction, and (3) the imposition of more than one punishment for the same offense. *People v. Gray*, 214 Ill. 2d 1, 6 (2005). As to the first prohibition, the defendant does not argue that he is being prosecuted for the same offense after an acquittal. As to the third prohibition, we note that the one-act, one-crime rule is used to enforce the third prohibition of double jeopardy, which is that a person should not suffer multiple punishments for the same act. *People v. Price*, 369 Ill. App. 3d 395, 404 (2006). The defendant's one-act, one-crime issue was a type of double jeopardy argument and, for the reasons set out above, we concluded that there was no one-act, one-crime violation. The defendant was not convicted on multiple counts based on a single act; rather, he was convicted and sentenced on multiple counts for having committed the same offense on multiple occasions against the same victim.

¶ 57    As to the second prohibition, the defendant will not be subject to future prosecution for an identical offense. As set forth in section 111-3 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/111-3(a) (West 2016)), a defendant has a fundamental right to be informed of the nature and cause of criminal accusations made against him. *People v. Rowell*, 229 Ill. 2d 82, 92-93 (2008). Section 111-3(a) provides:

> "(a) A charge shall be in writing and allege the commission of an offense by:
>
> > (1) Stating the name of the offense;
> >
> > (2) Citing the statutory provision alleged to have been violated;
> >
> > (3) Setting forth the nature and elements of the offense charged;
> >
> > (4) Stating the date and county of the offense as definitely as can be done;
>
> and
>
> > (5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty." 725 ILCS 5/111-3(a) (West 2016).

In the present case, each count cited the applicable statute that was violated, the nature of and the elements applicable to the charge, a specific time period within which the alleged offenses occurred, the county where the offenses occurred, the defendant's name, and the victim's identity. As such, the defendant would be able to assert a double jeopardy defense in bar of a subsequent prosecution for the same offense. See *People v. DiLorenzo*, 169 Ill. 2d 318, 325 (1996).

¶ 58    In so ruling, we note that the defendant relies on *Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005). In *Valentine*, the defendant was indicted on 20 identical counts of child rape and 20 identical counts of felonious sexual penetration of a child. *Id.* at 629. The indictment alleged the time frame within which the offenses occurred, mimicked the language of the statutes, and

identified the victim's birthdate. The victim testified that the defendant forced her to perform fellatio on "about" 20 occasions, he digitally penetrated her vagina on about "15" occasions, and he anally penetrated her on "about" 10 occasions. The defendant was found guilty on all counts and sentenced to 40 consecutive life terms. *Id.* On appeal, the reviewing court affirmed all the rape convictions but affirmed only 15 of the 20 counts for felonious sexual penetration. *Id.*

¶ 59    The *Valentine* defendant then raised a constitutional challenge to the indictment in a federal *habeas corpus* proceeding. *Id.* at 629-30. The *Valentine* court concluded that the indictment charging multiple, identically worded counts violated constitutional due process in two respects. First, the indictment failed to provide the defendant with notice of the multiple incidents for which he was tried and convicted. *Id.* at 634. Next, the lack of specificity in the indictment and the trial record subjected him to double jeopardy. *Id.* at 636. The court held that the defendant would be unable to protect himself against double jeopardy because he could be punished multiple times for the same offense. *Id.* at 634-35.

¶ 60    We find the defendant's reliance on *Valentine* unpersuasive, as that case is clearly distinguishable. Here, we concluded that the indictments were sufficient to put the defendant on notice of the offenses for which he was being charged. The evidence supported multiple counts of the same offense, as there was evidence that the offense occurred more than three times. The victim in the present case described the specific method of abuse/assault and testified that it happened almost every day she was in kindergarten. In *Valentine*, the court found that the prosecution failed to present factual bases for 40 separate incidents and the victim testified to only "typical" abusive behavior and stated that the "typical" abuse happened 15 or 20 times. *Id.* at 632-33. Further, unlike in *Valentine*, there is no double jeopardy concern because the indictment and the trial record are

sufficient to allow the defendant to plead his convictions as a bar to future prosecutions and we have explained that he was not punished multiple times for the same offense.

¶ 61    Moreover, we find the dissent in *Valentine* more persuasive. The dissenting justice explained that "prohibiting the use of multiple identical charges in a single indictment would severely hamper a state's ability to prosecute crimes where a young child is both the victim and the sole witness." *Id.* at 640 (Gilman, J., dissenting in part). Indeed,

> "[u]nder a rule restricting prosecutions to exceedingly narrow and precise charges, a sex-abuse charge would presumptively be limited to a single instance of abuse, despite clear evidence of multiple occasions, unless the child can remember the specific time and place details for each occurrence. Such an outcome is contrary to judicial precedent and is not constitutionally required." *Id.* at 641.

This reasoning is consistent with Illinois precedent. See *People v. Albarran*, 2018 IL App (1st) 151508, ¶ 23 (indictment need include only enough specificity for the defendant to prepare a defense); see also *Foster*, 2022 IL App (2d) 210556-U, ¶ 114 (identical charges in an indictment not improper where there is evidence and argument to support a finding of multiple acts).

¶ 62                                   C. Evidentiary Errors

¶ 63    The defendant's final contention on appeal is that evidentiary errors and inequitable decisions by the trial court denied him a fair trial. The defendant asserts that the trial court erred in (1) excluding certain testimony to rebut the other-crimes evidence as to A.A., (2) repeatedly sustaining the State' objections, and (3) making improper comments and favoring the prosecution. The defendant argues that if any of these errors alone do not amount to reversible error, then their cumulative effect denied him a fair trial.

¶ 64                        1. Evidence Rebutting Other-Crimes Evidence

¶ 65    The defendant first argues that the trial court erred in excluding testimony necessary to rebut the other-crimes evidence as to A.A. Specifically, the defendant asserts that the trial court erred in not allowing the defense to question Pantoja, the DCFS investigator who interviewed A.A. in 2014, about whether, in his opinion, A.A.'s mother's repeatedly asking A.A. about being touched had an effect on A.A.'s reliability. In addition, the defendant alleges that the trial court erred in excluding evidence that DCFS concluded that A.A.'s 2014 accusations were unfounded. The defendant asserts that he was thus prevented from attacking A.A.'s credibility and the credibility of the other crimes evidence as to A.A.

¶ 66    A determination of the admissibility of evidence is in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. Under the abuse of discretion standard, a reviewing court owes deference to the trial court's ability to evaluate the evidence's impact on the jury. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003). The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11. Reasonable minds can disagree about whether certain evidence is admissible without requiring a reversal of a trial court's evidentiary ruling under the abuse of discretion standard. *Donoho*, 204 Ill. 2d at 186.

¶ 67    In the present case, we cannot say, under this deferential standard, that the trial court abused its discretion in excluding testimony from Pantoja that, in 2014, DCFS determined A.A.'s accusations to be unfounded. "DCFS determining an accusation unfounded does not definitely establish that the accusation *** was false and is not probative of whether the accusation against defendant is false." *People v. Cookson*, 335 Ill. App. 3d 786, 793 (2002). Here, A.A. testified and

the defendant had the opportunity to cross-examine her regarding any inconsistencies. A.A.'s testimony was impeached by the testimony of Castro, Pantoja, and Garza. The jury was thus able to make its own assessment of A.A.'s credibility.

¶ 68    In arguing that the unfounded determination should have been admitted, the defendant relies on *People v. Nicholl*, 210 Ill. App. 3d 1001 (1991), and *People v. Ward*, 2011 IL 108690. We find both of these cases unpersuasive. In *Nicholl*, this court held that it was reversible error to exclude evidence that a DCFS investigation of alleged abuse concluded that the allegation was unfounded. *Nicholl*, 210 Ill. App. 3d at 1011. This court noted that the DCFS investigation related to a subsequent accusation made by the alleged victim in that case and that there was related alibi evidence for the defendant. Thus, this court concluded that the subsequent accusation was clearly a lie and that the defendant should have been allowed to attack the victim's credibility with the subject evidence. *Id.* In the present case, unlike in *Nicholl*, A.A. was not the victim and there was no evidence that her accusation was plainly false.

¶ 69    In *Ward*, our supreme court held that the trial court abused its discretion in allowing the State to introduce the defendant's alleged prior sexual assault of a different victim to prove his propensity but then precluding the defendant from eliciting evidence of his acquittal in the case arising out of that prior assault. *Ward*, 2011 IL 108690, ¶ 48. *Ward* is unpersuasive because a DCFS finding of "unfounded" is not the same as an acquittal. See *People v. Mason*, 219 Ill. App. 3d 76, 82 (1991) (a DCFS unfounded determination is not a judicial determination of the truth of an accusation, it is merely a recommendation not to continue proceedings). An acquittal is a certification, made by the trier of fact, that an accused person is not guilty of the charged offense. Black's Law Dictionary (11th ed. 2019). A DCFS finding of "unfounded" is merely a decision that there is not enough evidence to conclude that child abuse or neglect occurred. 89 Ill. Adm. Code

300.110(i)(3)(B) (1998). Moreover, a finding of unfounded in 2014 when A.A.'s claims were considered in isolation is not dispositive of A.A.'s credibility when considered with similar allegations of another kindergarten student three or four years later.

¶ 70    The trial court also did not abuse its discretion in prohibiting Pantoja from opining whether A.A.'s mother's repeated questioning about being touched affected A.A.'s credibility. It is generally considered improper to allow one witness to comment on the credibility of another witness. *People v. Becker*, 239 Ill. 2d 215, 236 (2010). Moreover, whether A.A. could have been influenced by M.M.'s repeated questions is not a matter beyond the ken of the average juror. *Id.* at 237. While the trial court prohibited Pantoja from opining on A.A.'s credibility, Pantoja's testimony impeached M.M.'s testimony. M.M. testified that she did not repeatedly ask A.A. whether she was touched, she did not offer A.A. candy before A.A.'s accusation, and A.A. was crying when she finally told M.M. about the abuse. In contrast, Pantoja testified that, during an interview, M.M. stated that she would ask A.A. every day whether she was being touched. M.M. told Pantoja that, on the day A.A. finally stated that she was being touched, A.A. initially laughed but finally admitted to being touched after M.M. said they were going to talk to God and then offered A.A. her favorite candy. Further, a stipulation from Officer Kubis regarding a conversation he had with M.M. on the day she called the police was similar to Pantoja's testimony. Accordingly, the jurors heard evidence about possible suggestive questioning by M.M. and were able to assess whether it could have influenced A.A.'s credibility.

¶ 71                    2. Meaningful Opportunity to Present a Defense

¶ 72    The defendant next argues that he was deprived of a fair trial because the trial court repeatedly sustained objections to his impeachment evidence and deprived him of a meaningful opportunity to present his defense. Only relevant evidence is admissible. Ill. R. Evid. 402 (eff. Jan.

1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 73    Specifically, the defendant argues that the trial court erred in not allowing testimony that L.R. was a troublemaker and she faced consequences for her behavior, which may have resulted in her fabricating the allegations against the defendant. However, our review of the record demonstrates that, despite the trial court's evidentiary rulings, evidence that L.R. misbehaved in school and was not always truthful was ultimately before the jury. M.R. testified that she would punish L.R. if her teacher called to say L.R. was not behaving. L.R. testified on cross-examination that she misbehaved in kindergarten and would get sent to a table to sit by herself. Krueger, the nurse, was permitted to testify that M.R. stated that L.R. had behavior issues in kindergarten. Aguilar testified that L.R.'s behavior needed a lot of correction during class. On one occasion, she overheard L.R. and two friends talking about boyfriends and sex, and she scolded them for being inappropriate. Aguilar also testified that, after Cruz's statements to Aguilar about the abuse, L.R. initially told her that the accusation was not true. The defendant testified that L.R. frequently misbehaved and was untruthful. Based on the foregoing, the defendant's contention that he was precluded from providing evidence to challenge L.R.'s credibility is without merit.

¶ 74    The defendant next argues that the trial court improperly sustained objections when the defendant tried to elicit testimony from L.R. that M.R. told her that, if she was lying, "she was going to pay for it." However, the defense was allowed to impeach L.R. with her statements to Arroyo, who confirmed that L.R. told him that her mom stated that she would "pay for it" if she was lying. The defendant also notes that objections were sustained when he raised questions about whether M.M. knew there was a DCFS investigation, when M.M. filed a related civil suit, whether

Aguilar ever called M.R. to say that L.R. was misbehaving, whether L.R. had problems with her friends or talked about boys with them, and whether Cruz was arguing with L.R. prior to Cruz telling Aguilar about the alleged abuse. The trial court did not abuse its discretion, as none of the foregoing testimony would shed any light on whether or make it more or less probable that the defendant committed the alleged offenses.

¶ 75    Finally, the defendant argues that it was particularly prejudicial to prevent him from eliciting testimony from L.R. that, in kindergarten, there was a male classmate who would kiss her on her private part. The defendant argues on appeal that it was relevant for the jury to know that L.R. had sexual knowledge that was unexpected for her age. The defendant is impliedly arguing that L.R.'s alleged advanced sexual knowledge increases the chances that she is lying about the defendant. In a sidebar in the trial court, when the trial court sustained objections to this testimony, the defendant argued that it was relevant to show that L.R. was making things up. We find no abuse of discretion here. L.R.'s prior sexual activity or reputation is not admissible. See 725 ILCS 5/115-7 (West 2016). Moreover, the alleged conduct with the boy in kindergarten (kissing her private part) is not relevant to whether the defendant assaulted L.R. by touching her "in the pants" at the reading table, as it does not establish any improper motive to lie about the defendant's alleged conduct. See *People v. Cookson*, 215 Ill. 2d 194, 214-15 (2005) (while a witness may be impeached with a bias, interest, or motive to testify untruthfully, the evidence must give rise to an inference that the witness has something to gain or lose by her testimony).

¶ 76                            3. Judicial Bias in Favor of the State

¶ 77    The defendant argues that he was deprived of a fair trial because the trial court made evidentiary rulings consistently favoring the State and made comments in front of the jury that showed prejudice to the defendant. Specifically, the defendant argues that the trial court

excessively sustained the State's objections, called for a break in the middle of the defendant's closing argument, and made disparaging comments to the defense in front of the jury.

¶ 78    Every defendant has a right to a fair trial. *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 60. Trial court comments that are demeaning or show hostility toward defense counsel may prevent the defendant from receiving a fair trial. *Id.* "Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place." *Id.* A trial court's displeasure or irritation toward defense counsel is not necessarily evidence of judicial bias. When a trial court properly exercises its role to control the trial and makes its comments with a valid basis, the conduct does not display specific prejudice against defense counsel requiring reversal. *Id.* ¶ 70. " '[I]n order for a trial judge's comments to constitute reversible error, a defendant must demonstrate that the comments constituted a material factor in the conviction or were such that an effect on the jury's verdict was the probable result.' " *Id.* ¶ 60 (quoting *People v. Harris*, 123 Ill. 2d 113, 137 (1988)). Whether a trial court's conduct deprived the defendant of a fair trial and warrants reversal of a conviction is reviewed *de novo*. *Id.*

¶ 79    The defendant first argues that the trial court made numerous comments that showed a negative opinion of the defendant's arguments. The defendant quotes numerous comments from the trial court, such as the trial court telling defense counsel "get off this topic," "I don't need a speech," "I'll allow the question for whatever weight the jury wants to give it," and "So that should have been the question before *** [s]o I'll sustain the objection." When these comments and the others provided are read in context, they are not prejudicial and demonstrate that the trial court was properly exercising control over the proceedings. For example, "get off this topic" was stated when defense counsel was trying to improperly make arguments in his opening statement. The "I don't need a speech" comments were made when, after the State made an objection, defense

counsel started giving an explanation although the trial court did not ask for a response and had not yet ruled on the State's objection. The trial court's comment that it would allow a question for "whatever weight the jury wants to give it" was when defense counsel asked Garza if a teacher was allowed to pat a student on the back and the State objected based on relevance. The trial court's comment, "so that should have been the question before," was after defense counsel asked the defendant whether he ever found L.R. to be untruthful in class. The State objected to the question, and the trial court sustained the objection as to foundation—"when, where, how it came about." Defense counsel stated that that would be the next question. The complained-of comment, therefore, was the trial court explaining that the second question should have been asked first so as to provide a foundation for the question about L.R.'s untruthfulness. We hold that the foregoing comments by the trial court, and the others set forth in the defendant's brief, were made with a valid basis and do not display bias or prejudice against the defendant. *Id.*

¶ 80    The defendant next argues that he was prejudiced because the trial court often provided the basis for the State's objections or sustained objections on grounds other than those offered by the State, essentially providing its own *sua sponte* rationale for objections. The defendant relies on Illinois Rule of Evidence 103(a)(1) (eff. Oct. 15, 2015), which indicates that there must be a basis stated for an objection. Upon review of the record, we hold that there was no prejudicial error. The trial court did not object on behalf of the State but merely ruled on the State's objections. We agree that the State did not always include a basis for its objections, but this was not necessarily improper. Rule 103(a)(1) more fully states that an objection should include a statement of "the specific ground of objection, if the specific ground was not apparent from the context." *Id.* Further, if an objection does not include a basis, the basis is presumed to be relevance. *People v. Martin*, 2017 IL App (4th) 150021, ¶ 16. We also acknowledge that, in ruling on a State objection, the trial

court often provided a basis that was not consistent with the basis offered by the State. However, the defendant has not cited, and we have not found, any authority to show that it is improper to sustain an objection on a valid basis, even if the basis is different from that offered by the objecting attorney. When viewing the trial court's actions in context, we cannot say that the trial court abandoned its role as a neutral arbiter or showed unfair favoritism toward the prosecution.

¶ 81    The defendant also argues that it was improper for the trial court to call for a break in the middle of his closing argument, rather than allowing him to argue without interruption. We hold that this was not prejudicial error. The record shows that the trial court had informed the jury before closing arguments began that it would call for a break at some point during the closing arguments. The record also shows that the break was taken at that particular time during the defendant's closing argument because the defendant had made some objectionable arguments. Specifically, the defendant argued that proof beyond a reasonable doubt required more than L.R.'s statements alone, that it required corroboration, and that accusations were not proof. The defendant also made an analogy to the 1693 Salem witch trials, where 20 people were hung because teenagers said they were witches. The trial court took the break because it wanted to explain why it was sustaining objections to these arguments and why it was reminding the jury that closing arguments were not evidence—that the jury was to decide the facts of the case. The trial court's conduct was aimed at maintaining decorum and proper procedure during the trial.

¶ 82    Finally, the defendant argues that the alleged errors, if not singularly then cumulatively, denied him a fair trial. "[W]hile individual trial errors may not require a reversal, those same errors considered together may have the cumulative effect of denying defendant a fair trial." *People v. Speight*, 153 Ill. 2d 365, 376 (1992). As explained above, however, we determined that none of the alleged claims of error had any merit. Accordingly, the defendant's claimed errors, individually

or cumulatively, do not warrant reversal or a new trial. See *People v. Perry*, 224 Ill. 2d 312, 356 (2007) (holding that cumulative error analysis was unnecessary where the court had rejected all the defendant's individual claims of error).

¶ 83                                III. CONCLUSION

¶ 84     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 85     Affirmed.

*People v. Avendano*, **2023 IL App (2d) 220176**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 18-CF-516; the Hon. Salvatore LoPiccolo Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Amaris Danak, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |