2023 IL App (2d) 230035-U
No. 2-23-0035
Order filed October 24, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-109 |
| RAMIRO GONSALEZ-GARCIA, | ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice McLaren and Justice Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions of sex offenses against child victim could be raised as a bar to future prosecutions arising out of the same conduct and, thus, there was no double jeopardy violation, where the indictment alleged "separate and distinct acts" of abuse occurring during separate time frames, and the trial evidence further differentiated the acts both by the incentives defendant used to induce the victim to submit to the acts and by the type of penetration.

¶ 2    Following a bench trial, defendant, Ramiro Gonsalez-Garcia, was convicted of nine counts

of predatory criminal sexual assault of a child (PCSAC) (720 ILCS 5/11-1.40(a)(1) (West 2018)).

The trial court sentenced him to seven years in prison on each count, to be served consecutively.

Defendant appeals from his convictions on six of those counts, arguing that the indictment, along with the trial evidence, was insufficient to protect him against double jeopardy. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In February 2020, defendant was indicted on nine counts of PCSAC. The victim was his girlfriend's son, C.P., with whom he lived. Each count alleged that defendant committed the offense of PCSAC in that

> "defendant, who was seventeen years of age or older, knowingly committed an act of
> contact, however slight, between the sex organ or anus of one person and the part of the
> body of another for the purpose of sexual gratification or arousal of the victim or the
> accused, or an act of sexual penetration, with C.P[.] (a male minor, born 2009), who was
> under thirteen years of age when the act was committed."

Counts I and II each alleged that the act occurred "on or between August 1, 2014[,] through July 31, 2015[.]" Counts III through V each alleged that the act occurred "on or between August 1, 2016[,] and May 31, 2018[.]" Counts VI through VIII each alleged that the act occurred "on or between June 1, 2018[,] and May 31, 2019[.]" Count IX alleged that the act occurred "on or about January 25, 2020[.]" In addition, each count charged the act as a "separate and distinct act." For instance, count I charged the act as "a first separate and distinct act," count II charged the act as a "a second separate and distinct act," count III charged the act as a "a third separate and distinct act," and so on.

¶ 5      A bench trial took place in October 2022. At the outset, the State made an oral motion to amend the indictment. It asked to amend counts I through VII and count IX to allege "penis to anus contact" and to amend count VIII to allege "finger to anus" contact. Defense counsel objected. The trial court noted that the State was asking only to provide "greater specificity

regarding what the identified act of sexual penetration was." Nevertheless, the court stated that, "[i]f the defense is opposed to that specificity, then the defense's objection is sustained."

¶ 6    Thereafter, the following relevant evidence was presented.[1] Maria A. testified that she had two children: C.P., who was 13 years old and in 8th grade, and A.G., who was 8 years old and in 3rd grade. Defendant was A.G.'s father but not C.P.'s father. At the time of trial, Maria lived with her children in a duplex on Lake Street in McHenry County (Lake Street apartment). She moved to the Lake Street apartment with defendant, C.P., and A.G. sometime in 2015 or 2016. Before then, they lived in an apartment at Garden Quarters (Garden Quarters apartment).

¶ 7    Maria testified that, when she lived at the Garden Quarters apartment and the Lake Street apartment, she worked at McDonald's. Her hours were generally Tuesday through Saturday from 7 a.m. to 3 p.m. or 6 a.m. to 2 p.m. She always worked the morning shift on Saturdays. Defendant would take care of A.G. and C.P. on Saturdays while she worked. Sometimes, C.P.'s father would take care of them. If neither was available, "a lady" would take care of the children.

¶ 8    Maria testified that Saturday, January 25, 2020, was the final Saturday that defendant watched C.P. and A.G. On the following Friday, January 31, 2020, C.P. told her that he did not want to be left with defendant the next day. Maria asked C.P. if defendant had hit him. C.P. said no and started to cry. She then asked C.P. if defendant had "touched him." C.P. said yes. When Maria asked where defendant touched him, C.P. pointed to "[h]is behind area."

¶ 9    Maria testified that, in response to further questioning, C.P. told her that defendant would have C.P. kneel on the mattress in the bedroom that Maria and defendant occasionally shared.

---

[1]Prior to trial, the trial court granted the State's motion *in limine* to introduce C.P.'s out-of-court statements to his mother, an investigator, and a forensic interviewer.

Sometimes defendant would put his hand over C.P.'s mouth and tell him not to yell so that the neighbors would not hear him. Then defendant "would send [C.P.] to the bathroom to go number two and told him that he couldn't come out until he did it." After C.P.'s disclosure, Maria called C.P.'s godmother. When C.P.'s godmother arrived, at about 2 a.m., Maria, C.P's godmother, and C.P. confronted defendant with C.P.'s allegations. Defendant told them that "he didn't do anything, and then he said he didn't remember."

¶ 10    The next day, Maria told defendant that she was going to call the police. Defendant asked her not to and said that he would turn himself in. Maria, defendant, and C.P. went to the police station together. After the police took their statements, she went with C.P. to the hospital, where C.P. was examined. About six hours later, they went to Woodstock, where C.P. was interviewed.

¶ 11    Maria testified that C.P. had a tablet when they lived at the Garden Quarters apartment. She stated: "It seems like it was white." She also stated: "He had another black one, but I don't remember." She testified that she bought the black tablet used. When asked if C.P. had access to the black tablet at the Lake Street apartment, she replied: "No, the white one." She had never seen defendant touch C.P. inappropriately.

¶ 12    C.P. testified that he was in eighth grade and lived at the Lake Street apartment with Maria, A.G., and his uncle. He saw his father every weekend. He has lived at the Lake Street apartment for eight years. Before that, he lived at the Garden Quarters apartment. He was in kindergarten and "[about] four" when he lived at the Garden Quarters apartment; A.G. was "a couple months old." C.P. testified that the Lake Street apartment had two bedrooms. When they moved from the Garden Quarters apartment to the Lake Street apartment, defendant lived with them. At that time, C.P. shared a bedroom with A.G. and Maria; defendant had his own bedroom.

¶ 13    C.P. testified that Maria worked at McDonald's on Tuesdays through Saturdays from 6 a.m. to 4 p.m. Defendant watched C.P. and A.G. on Saturdays. The final Saturday defendant watched C.P. and A.G. was January 25, 2020. At the time, C.P. was ten years old and in fifth grade. That morning, defendant gave A.G. a tablet and told A.G. to go to the room that A.G., C.P., and Maria shared. Defendant told C.P. to go to defendant's room. Defendant locked the door, told C.P. to get on the bed, and pulled down C.P.'s pants and underwear. Defendant then "proceeded to put his penis and finger in [C.P.'s] butt, not at the same time." C.P. stated that it "felt painful." C.P. testified that defendant would "put his penis in [C.P.'s] butt [and] go in and out repeatedly and sometimes his finger." C.P. could not see what defendant was doing because defendant told him "to look away." C.P. could hear a "spitting sound" and then "[i]t felt moist. Like sort of wet around." C.P. could tell the difference between defendant's penis and finger because defendant's finger felt "sharper." C.P. could feel defendant's "fingernails"; "[t]hey were sharper than his penis," as "[h]e didn't really cut them that much." After defendant was done, he told C.P. to go to the bathroom. C.P. "wouldn't go number two." Defendant would have C.P. sit on the edge of the bathtub, defendant would turn on the faucet, and defendant would wipe C.P.'s butt.

¶ 14    C.P. testified that the January 25, 2020, incident was not the only time "something like this had happened." C.P. stated that it happened "[a] lot of times." C.P. remembered that it had happened "[a]t least once in Garden Quarter[s], but a lot of times in Lake Street." It happened "many other times," and it was "not really" ever different.

¶ 15    C.P. testified regarding the incident at the Garden Quarters apartment. According to C.P., defendant brought home a "white and brownish" bunny. Defendant told him that if C.P. wanted to keep the bunny C.P. would "have to go to [defendant's] room and pull [his] pants down and

stuff and like, then \*\*\* let [defendant] put his finger and penis in [C.P.'s] butt." Similar to what occurred later in the Lake Street apartment, defendant "put his penis into and finger into [C.P.'s] butt." It lasted for a "[c]ouple minutes." When this happened, Maria was at work and A.G., who was only a couple of months old, was in the living room. C.P. remembered leaving the balcony doors open, seeing the bunny "jump out of the balcony," and "being disappointed."

¶ 16    C.P. testified that, at the Lake Street apartment, defendant used a tablet to get C.P. to go into defendant's bedroom. It was a "white tablet" with a "green case on it." C.P. explained:

> "[Defendant] would, like, take it away from me. Then, like, tell me if I wanted to use it, I had to let him put his finger and penis in my butt. And same thing with the black tablet that my dad bought me, like, fourth grade."

C.P. testified that, like he did at the Garden Quarters apartment, defendant would take C.P. to defendant's room, remove C.P.'s pants and underwear, tell C.P. to lie down, and then defendant would put his penis and finger inside C.P.'s butt. When asked how many times this occurred with the white tablet, C.P. responded "Oh, like a lot of times, like over 10, over 50. A lot of times."

¶ 17    C.P. testified that defendant also used a "black tablet" to get C.P. to go into defendant's bedroom. C.P. had the white tablet "first"; his dad bought him the black tablet when he was "around fourth grade." Defendant used the black tablet in the same way that he used the white tablet. C.P. explained:

> "[Defendant] would take it, tell me if I wanted it, I would have to go to [defendant's] room and then put his penis and finger in my butt."

C.P. stated that the incidents with the black tablet "didn't differ" from the incidents with the white tablet or the bunny. When asked how many times defendant used the black tablet, C.P. responded, "[a] lot of times." C.P. stated, "It was always his penis but, like, not always his finger." C.P. did

not know specifically how many times defendant used only his penis and how many times defendant used both his penis and finger.

¶ 18    C.P. testified that he never told anyone what defendant was doing because he was afraid of "[defendant] hurting us." He explained that, when he was in kindergarten, around the same time that the sexual abuse began, defendant used to make C.P. "scratch the bottom of his feet" and "pop pimples" on his back. C.P. did not like doing that, so he told Maria. One day, defendant picked him up from kindergarten. Defendant and C.P. were sitting on the couch together, and defendant was on the phone. When defendant got off the phone, he began to hit C.P. and slap C.P.'s face. C.P. believed that it was because C.P. told Maria that defendant was making C.P. scratch defendant's feet.

¶ 19    C.P. testified that, when he was in fifth grade, he told Maria what defendant had been doing to him. The next day was Saturday, and he did not want to be left alone with defendant because of the things that defendant would make him do. Maria called C.P.'s godmother. When his godmother came over, they confronted defendant, who denied C.P.'s claims. The next day, they went to the police station, where C.P. spoke with an officer. C.P. next went to the hospital for an examination. After that, he spoke with an investigator.

¶ 20    Anna Krause testified that she was the operations manager and lead forensic interviewer with the Child Advocacy Center in McHenry County. She interviewed C.P. at about 11 p.m. on February 1, 2020. She identified People's Exhibit No. 1 as the DVD recording of the interview, which was about 45 minutes long. The recording was admitted into evidence and played for the trial court.

¶ 21    C.P. made the following relevant statements in the video. C.P. told Krause that he was 10 years old and in the fifth grade. C.P. went to the hospital because defendant had "basically—um—

raped" him "a few times before" and that he "decided enough was enough so [he] told his mom and went to the police station and reported [defendant]." C.P. told Krause that Maria left C.P. with defendant on weekends when she went to work at McDonald's. C.P. explained that defendant would first give A.G. his tablet and tell him to go to his room. Then defendant would tell C.P. to go to defendant's room and lay down on his stomach. Defendant would take off C.P.'s shorts and underwear. C.P. "felt something going up [his] butt repeatedly over and over and it hurt." When defendant was done, he told C.P. "to go to the bathroom and go number two and [he] couldn't get up until [he] did number two." Defendant told him not to flush.

¶ 22    C.P. told Krause that defendant put "his finger or his penis" up C.P.'s butt. Sometimes C.P. could feel "something hard, like, scratching [him]" at the "corner of [his] butt" on the "inside." Sometimes C.P. heard defendant "spit" and then felt "liquid" up his butt. Defendant used "his hand" on C.P.'s "back" to push C.P. down on the mattress. Sometimes C.P. screamed because it hurt so bad, and defendant would cover his mouth and tell him to be quiet "or else the woman upstairs will hear."

¶ 23    C.P. told Krause that the last time this happened was "last week" and that it had not happened in a while. Defendant was "putting his hand in [C.P.'s] butt." C.P. felt "multiple fingers." C.P. could not remember how many times the abuse happened while he was in fifth grade.

¶ 24    C.P. reported that the abuse had started "like five years ago." It was about a month after defendant "officially" moved in with C.P.'s family. C.P. remembered that, when he was in first grade, defendant brought a brown and white bunny home to the Garden Quarters apartment. C.P.'s mom was at work. C.P. wanted to pet the bunny, and defendant told him that he first "had to let

[defendant] do that." His mom did not know about the bunny. The bunny ran off and he never saw it again.

¶ 25 When C.P. was in fourth grade, defendant would not let him use his tablet until he did what defendant wanted him to do. When asked how many times this happened, C.P. stated that he did not know. C.P. said it was "multiple" times and "a lot." It was "more than two" times. C.P.'s first tablet was white with a green case. C.P. stopped using the white tablet, and his dad bought him a new tablet. Defendant used the new tablet in the same manner as he used the white tablet, telling C.P. he must let defendant do what he wanted to do before C.P. could use the tablet. Defendant used the new tablet more than two times. C.P. said that defendant never used any other reasons to get C.P. to let him do what he wanted to do.

¶ 26 C.P. reported that the abuse happened in the bedroom at the Garden Quarters apartment and in defendant's room at the Lake Street apartment. C.P. reported that defendant told him not to tell anyone what he did. Defendant never threatened him, but when C.P. was in kindergarten, defendant hit C.P. when C.P. reported to his mom that defendant was making him scratch his feet and that C.P. did not want to do it anymore. C.P. told Krause that he "hated" what defendant was doing to him and that he "finally got the courage" to tell his mom.

¶ 27 McHenry County sheriff's deputy Jenifer Asplund testified that she met with C.P. and Maria at the police station on February 1, 2020. C.P. reported that he was ten years old and had lived at the Lake Street apartment for five years with defendant, Maria, and A.G. Before then, they lived at the Garden Quarters apartment. C.P. told her that defendant had abused him at both locations. The last time defendant had abused him was on January 25, 2020, when Maria left for work. At that time, defendant gave A.G. a tablet and told him to go to his room. Defendant told C.P. to go into defendant's room and to lie face down on the bed. Asplund testified: "[Defendant]

removed [C.P.'s] pants bottom and his underwear leaving his shirt on and then placed his penis inside his anus going in and out several times slowly." C.P. told her that when defendant was done, he told C.P. to "go into the bathroom, [C.P.] would have to go number two which is poo, and he couldn't exit the bathroom until he was done, all instructed by [defendant]." C.P. told Asplund that this had happened other times with defendant in the same manner. After giving A.G. a tablet and telling him to go to his room, defendant would direct C.P. to defendant's room. Defendant would "place his penis or other unknown—like fingers and other unknown objects into his penis [*sic*], and he is to go—after he's done, meaning [defendant] is done, he is told to go to the bathroom and go number two before he can exit the room." C.P. told her that "sometimes he would hear [defendant] spitting, and the penis would slide in easier in his anus and wouldn't hurt as much as other times. Sometimes it would hurt more than others." After speaking with Asplund, C.P. went to the hospital for an examination.

¶ 28    At the close of the State's evidence, defendant moved for a directed finding as to either count I or II, arguing that C.P. testified to only one incident occurring at the Garden Quarters apartment. The trial court denied the motion, noting that C.P. testified that defendant placed both his penis and finger into C.P.'s anus and that those two acts could support a finding of two separate acts as charged in counts I and II. The court also noted that defendant had objected to the State's attempt to amend the indictment to allege more specifically the type of penetration.

¶ 29    Defendant did not present evidence.

¶ 30    The trial court found defendant guilty of all counts of PCSAC. The court stated that the case turned on the credibility of C.P. The court considered C.P.'s statements during the interview, when he was ten years old, and C.P.'s trial testimony, when he was 13 years old. The court noted that C.P.'s testimony was relatively consistent with his earlier statements and that any minor

inconsistencies showed his credibility. The court also rejected defense counsel's theory that Maria influenced C.P. to fabricate his claims against defendant to force defendant to remain in Illinois and not go to Mexico with another woman.

¶ 31    The trial court noted that the differences among the various counts related only to when the acts were alleged to have occurred. The court noted that counts I and II related to acts alleged to have occurred between August 1, 2014, and July 31, 2015, when C.P. lived at the Garden Quarters apartment. The court found that C.P.'s testimony established one occurrence at the Garden Quarters apartment, which was tied to defendant's use of a bunny. The court further found that, although the testimony established one occurrence, the occurrence was comprised of two acts—sexual penetration of C.P.'s anus with defendant's penis and sexual penetration of C.P.'s anus with defendant's finger—and thus supported findings of guilty on both counts I and II.

¶ 32    The trial court next noted that count IX related to the events alleged to have occurred on January 25, 2020, the final Saturday that defendant was left alone with C.P. The court found that C.P.'s testimony was sufficient to prove that defendant placed his finger in C.P.'s anus on that date.

¶ 33    The trial court next addressed counts III through V, which charged acts alleged to have occurred between August 1, 2016, and May 31, 2018, and counts VI through VIII, which charged acts alleged to have occurred between June 1, 2018, and May 31, 2019. The court noted that the acts charged in counts III through VIII all took place in the Lake Street apartment. The court further noted that the significance of the dates was "their orientation to a white laptop and a black laptop." The court stated:

> "Regarding the white tablet, the victim said it was used, quote, a lot of times, end
>     quote. He said probably over ten times and maybe over fifty.

The victim said the black tablet was used, quote, a lot of times, end quote.

The victim was clear that every occasion involved penis in anus penetration but not always finger in anus.

The question simply is, has the state proven or established beyond a reasonable doubt six incidents of abuse in the noted time frame?

As previously noted, this could actually encompass only three incidents if each involved penis penetration and finger penetration.

Regardless of the factual dynamic, six separate events or three combined events, the state has proven these charges beyond a reasonable doubt.

On Counts Three through Eight inclusive, the defendant is therefore found guilty."

¶ 34 Defendant filed a motion for a new trial, which raised no double jeopardy claims. The trial court denied the motion. Following a sentencing hearing, the trial court sentenced defendant to seven years in prison on each count, to be served consecutively. Defendant filed a motion for reconsideration of his sentence, which the court denied.

¶ 35 This timely appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37 Defendant appeals from his convictions on counts III through VIII of the indictment. He contends that his right to be protected from double jeopardy was violated because the multiplicitous indictment, along with the trial evidence, failed to provide enough specificity to allow pleading the resulting convictions as a bar to future prosecutions arising out of the same conduct.

¶ 38 A criminal defendant has a fundamental right, under both the United States Constitution (U.S. Const., amend. VI) and the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 8), to be

informed of the nature and cause of criminal accusations made against him. *People v. Libricz*, 2022 IL 127757, ¶ 35. In Illinois, this right is delineated in section 111-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/111-3 (West 2018)). See *Libricz*, 2022 IL 127757, ¶ 35.

> " 'Section 111-3(a) demands that the charging instrument be in writing, stating the name of the offense and the relevant statutory provision violated, setting forth the nature and elements of the offense and the date and county in which the offense occurred, and naming the accused if known or a reasonably certain description.' " *Id.* (quoting *People v. Meyers*, 158 Ill. 2d 46, 51 (1994)).

¶ 39 When the sufficiency of the charging instrument is attacked in a pretrial motion, the charging instrument must strictly comply with the requirements of section 111-3(a) of the Code. *Libricz*, 2022 IL 127757, ¶ 37. However, when an indictment is challenged for the first time on appeal, as in the present case, " 'the standard of review is more liberal.' " *Id.* (quoting *People v. DiLorenzo*, 169 Ill. 2d 318, 322 (1996)). In such a case, " 'it is sufficient that the indictment apprised the accused of the precise offense charged with enough specificity to (1) allow preparation of his defense and (2) allow pleading a resulting conviction as a bar to future prosecutions arising out of the same conduct.' " *Id.* (quoting *DiLorenzo*, 169 Ill. 2d at 322).

¶ 40 We note that defendant makes no argument that the indictment was not sufficiently specific to allow the preparation of his defense. (Nor does he argue that the evidence was insufficient to prove him guilty beyond a reasonable doubt.) Instead, defendant argues that the indictment, along with the trial evidence, was insufficient to protect him from double jeopardy.

¶ 41 "The double jeopardy clause of the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.' " *People v. Bellmyer*, 199

Ill. 2d 529, 536-37 (2002) (quoting U.S. Cons., amend. V). The Illinois Constitution similarly precludes any person from being "twice put in jeopardy for the same offense." Ill. Const. 1970, Art. I, § 10. The double jeopardy clause bars three specific governmental actions: "(1) prosecution for the identical offense after an acquittal, (2) prosecution for the identical offense after a conviction, and (3) the imposition of more than one punishment for the same offense." *People v. Avendano*, 2023 IL App (2d) 220176, ¶ 56. At issue here is whether the indictment, along with the evidence, was sufficient to protect defendant against prosecution for the identical offense after conviction.

¶ 42    First, although defendant does not dispute it, we note that there is no question that the indictment charged defendant with enough specificity to allow the preparation of his defense. Counts III through VIII of the indictment charged defendant with PCSAC. Each count specifically named the alleged offense, cited to the relevant statutory provision, indicated the county where the offense occurred, and stated defendant's name. In addition, each count specifically provided, in the words of the statute, that defendant committed the offense of PCSAC in that

> "defendant, who was seventeen years of age or older, knowingly committed an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, with C.P[.] (a male minor, born 2009), who was under thirteen years of age when the act was committed."

Further, as for the date of the offense, counts III through V each charged defendant with a "separate and distinct act" of sexual conduct with C.P. occurring between August 1, 2016, and May 31, 2018. Counts VI through VIII each charged defendant with a "separate and distinct act" of sexual conduct with C.P. occurring between June 1, 2018, and May 31, 2019. We note that the State was

not required to provide a precise date of the offense. See *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (2005) ("As long as the crime occurred within the statute of limitations and prior to the return of the charging instrument, the State need only provide the defendant with the best information it has as to when the offenses occurred."). In addition, had defendant believed that the indictment lacked sufficient specificity, he could have requested a bill of particulars. See *DiLorenzo*, 169 Ill. 2d at 324. Indeed, when the State attempted to amend the indictment to provide greater specificity, defendant objected. In any event, the indictment makes clear that defendant was charged with three separate acts of sexual conduct with C.P. occurring between August 1, 2016, and May 31, 2018, and three separate acts of sexual conduct with C.P. occurring between June 1, 2018, and May 31, 2019.

¶ 43     There is no merit to defendant's argument that the indictment is an impermissible multiplicitous indictment that exposes him to double jeopardy. An indictment is multiplicitous if it "charges a single offense as separate counts." *United States v. Ajayi*, 808 F.3d 1113, 1123 (7th Cir. 2015) (citing *United States v. Starks*, 472 F.3d 466, 468-69 (7th Cir. 2006)). Such an indictment violates the double jeopardy clause of the fifth amendment because it exposes the defendant "to the threat of receiving multiple punishments for the same offense." *Id.* That is not the case here. As noted, counts III through VIII allege six "separate and distinct" acts supporting six "separate and distinct" violations of the same statute with the same victim. Defendant was not charged with multiple counts based on a single act.

¶ 44     Nevertheless, defendant contends that, although the indictment charged counts III through VIII as "separate and distinct" acts, there was no language in the indictment that meaningfully distinguished each count for purposes of double jeopardy. Defendant acknowledges that, in determining whether the indictment protects defendant from double jeopardy, we may consider

the record. See *Guerrero*, 356 Ill. App. 3d at 29 ("A prior prosecution can easily be proven by reference to the record, thereby protecting a defendant from being placed in double jeopardy."). However, defendant argues that the record in fact supports his argument because C.P. testified that he submitted to the acts in exchange for the use of either a white or black tablet and that this occurred "over 50" times. According to defendant, there was nothing in the evidence that differentiated the 6 counts at issue from the rest of the alleged 50 or more acts. Thus, he asserts that the indictment, along with the evidence presented at trial, was insufficient to allow pleading a resulting conviction as a bar to future prosecutions arising out of the same conduct.

¶ 45    In support, defendant relies primarily on *Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005). In *Valentine*, the defendant was charged with sexually abusing his eight-year-old stepdaughter between March 1, 1995, and January 16, 1996. *Id.* at 629. The indictment charged 20 counts of child rape and 20 counts of felonious sexual penetration. *Id.* at 628. Each count of child rape "was identically worded so that there was no differentiation among the charges[,]" as was each count of felonious sexual penetration. *Id.* Although the State provided the defendant with a bill of particulars, it "merely restated the allegations and identified the family home as the location of all forty offenses." *Id.* at 629. At trial, the child victim did not testify to specific instances of abuse; instead, the victim testified that the defendant forced her to perform fellatio "on 'about twenty' occasions," he digitally penetrated her vagina on about "on 'about fifteen' occasions," and he anally penetrated her with his penis "on 'about ten' occasions." *Id.* at 629. The jury found the defendant guilty of all 40 counts, and he was sentenced to 40 consecutive life sentences. *Id.* The Ohio Court of Appeals affirmed the 20 child-rape convictions but only 15 of the 20 felonious-sexual-penetration convictions. *Id.*

¶ 46    The defendant then filed a federal *habeas corpus* petition claiming that the indictment violated his due process rights because it lacked specificity. *Id.* at 629-30. The Sixth Circuit held that the prosecution violated the defendant's rights to adequate notice and protection from double jeopardy, justifying a grant of *habeas* relief on all counts but two. *Id.* at 637. The court reasoned that, in "view of the testimony and the indictment language, one of the child[-]rape and one of the penetration counts can be sustained but that the others must be set aside." *Id.* at 628. The court determined that the 20 child-rape counts charged one crime and that the 20 penetration counts charged another crime. *Id.* at 629. The court stated that the defendant had notice that he was charged with these two separate crimes during the time period specified in the indictment, "[b]ut he had no way to otherwise identify what he was to defend against in the repetitive counts and no way to determine what charges of a similar nature could be brought against him in the future if he were re-indicted." *Id.* at 628-29. The court held that, because the defendant was charged and convicted "for a generic pattern of abuse rather than for forty separate abusive incidents," he was entitled to partial *habeas* relief. *Id.* at 634, 639.

¶ 47    The court went on to note:

>      "Importantly, the constitutional error in this case is traceable not to the generic language of the individual counts of the indictment but to the fact that there was no differentiation among the counts. The exigencies of child abuse cases necessitate considerable latitude in the construction of criminal charges. The prosecutors in this case, however, abused this wide latitude by piling on multiple identical counts. Numerous charges cannot be made out through estimation or inference. Instead, if prosecutors seek multiple charges against a defendant, they must link those multiple charges to multiple identifiable offenses. Due process requires this minimal step. Courts cannot uphold

multiple convictions when they are unable to discern the evidence that supports each individual conviction." *Id.* at 636-637.

The court stated that, "[h]ad this case been tried in two counts, the convictions would clearly stand." *Id.* at 637. The court also noted that differentiating between counts does not require "overly-burdensome precision" or "exacting specificity," but can be accomplished by using different timeframes, types of offenses, or generic locations. *Id.* "[T]here must be some minimal differentiation between the counts at some point in the proceeding." *Id.* at 638.

¶ 48 Recently, in *Avendano*, we considered the same argument defendant now makes. *Avendano*, 2023 IL App (2d) 220176, ¶¶ 55-61. The *Avendano* defendant also relied on *Valentine*. In *Avendano*, the defendant was charged with, *inter alia*, three counts of PCSAC. *Id.* ¶ 3. Each of the three counts alleged that, on or about January 1, 2016, through December 31, 2017,

> " '[the] defendant, a person seventeen years of age or over, knowingly committed an act of sexual contact with L.R., a child under the age of thirteen years when the act was committed, in that the defendant touched the sex organ of L.R. with his hand for the purpose of the sexual arousal of the defendant.' " *Id.*

L.R., who was 10 years old at the time of trial, testified that the defendant had been her kindergarten teacher and that he "would touch her with his hand under her clothes where she goes pee." *Id.* ¶ 10. She testified that he was " 'always' " touching her " 'private part' " and that it happened " 'more than one time' "—indeed, " '[e]very time [she] was in school.' " *Id.* A jury found the defendant guilty of each count of PCSAC. *Id.* ¶ 37.

¶ 49 On appeal, relying on *Valentine*, the defendant argued, *inter alia*, that two of his three convictions of PCSAC must be vacated "because the multiplicitous indictments deprived him of his due process right to be protected from double jeopardy." *Id.* ¶¶ 55, 58. We disagreed. *Id.*

¶ 60. First, we found that "the indictments were sufficient to put the defendant on notice of the offenses for which he was being charged." *Id.* As in the present case, "each count cited the applicable statute that was violated, the nature of and the elements applicable to the charge, a specific time period within which the alleged offenses occurred, the county where the offenses occurred, the defendant's name, and the victim's identity." *Id.* ¶ 57.

¶ 50 Next, we rejected the defendant's reliance on *Valentine*, finding the case distinguishable. We found that, unlike in *Valentine*, "[t]he evidence supported multiple counts of the same offense, as there was evidence that the offense occurred more than three times. The victim in the present case described the specific method of abuse/assault and testified that it happened almost every day she was in kindergarten." *Id.* Thus, we concluded: "[T]here is no double jeopardy concern because the indictment and the trial record are sufficient to allow the defendant to plead his convictions as a bar to future prosecutions." *Id.*

¶ 51 Moreover, we made clear that we found the *Valentine* dissent more persuasive than the majority. We stated:

"The dissenting justice explained that 'prohibiting the use of multiple identical charges in a single indictment would severely hamper a state's ability to prosecute crimes where a young child is both the victim and the sole witness.' [Citation.] Indeed,

'[u]nder a rule restricting prosecutions to exceedingly narrow and precise charges, a sex-abuse charge would presumptively be limited to a single instance of abuse, despite clear evidence of multiple occasions, unless the child can remember the specific time and place details for each occurrence. Such an outcome is contrary to judicial precedent and is not constitutionally required.' [Citation.]" *Id.* ¶ 61.

We further noted that the dissent's reasoning was consistent with Illinois precedent. See *People v. Albarran*, 2018 IL App (1st) 151508, ¶ 23 (indictment need include only enough specificity for the defendant to prepare a defense); see also *People v. Foster*, 2022 IL App (2d) 210556-U, ¶ 114 (identical charges in an indictment not improper where there is evidence and argument to support a finding of multiple acts).

¶ 52    We continue to adhere to our decision in *Avendano*. As in *Avendano*, the indictment and the trial record are sufficient for defendant to assert a double jeopardy defense to bar a subsequent prosecution for the offenses alleged in counts III through VIII.

¶ 53    To be sure, C.P. testified that there were over 50 incidents of sexual conduct between defendant and C.P. However, unlike in *Valentine*, the State here did not "pil[e] on multiple identical counts" in the indictment. *Valentine*, 395 F.3d at 636. Instead, the State charged defendant with nine separate and distinct acts, occurring between August 2014 and January 2020, and distinguished them by the time periods within which they occurred. Relevant here, counts III through V alleged three separate and distinct acts occurring during one period, and counts VI through VIII allege three separate and distinct acts occurring during a second period. This is vastly different than the 40 charges at issue in *Valentine*.

¶ 54    Moreover, unlike in *Valentine*, although the indictment did not provide factual differentiation among the three counts alleged in the two different periods, the evidence at trial did. C.P.'s testimony established two distinct time periods tied to defendant's use of either a white tablet (counts III through V) or a black tablet (counts VI through VIII) as an incentive for C.P. to submit to sexual acts. C.P. testified that, prior to fourth grade, he had a white tablet. The evidence supports the conclusion that C.P. attended fourth grade during the 2018/2019 school year. Thus, counts III through V are tied to sexual acts committed by defendant at the Lake Street apartments,

using the white tablet as an incentive, prior to C.P. entering fourth grade. C.P. testified that if C.P. wanted to use the tablet, he "had to let [defendant] put his finger and penis in [C.P.'s] butt." C.P. testified that the sexual acts consisted of defendant "always" placing his penis in C.P.'s anus but "not always his finger." C.P. testified that these occurrences happened over 50 times. Therefore, this testimony established, *at a minimum*, two occurrences of sexual conduct between defendant and C.P. during that period. One occurrence consisted of an act of defendant placing only his penis in C.P.'s anus. The second occurrence consisted of two acts—one act of defendant placing his penis in C.P.'s anus and another act of defendant placing his finger in C.P.'s anus. Thus, C.P.'s testimony established three separate and distinct acts during the period alleged in counts III through V.

¶ 55    Similarly, counts VI through VIII are tied to sexual acts committed by defendant at the Lake Street apartments using the black tablet as an incentive. C.P. testified that he obtained a black tablet when he was in fourth grade. C.P. testified that the same kind of incidents that had happened with the white tablet also happened with the black tablet. When asked if the incident with the black tablet happened just one time, C.P. stated that it happened "[a] lot of times." Thus, as with the allegations tied to the white table, C.P.'s testimony related to the black tablet established that at least two separate occurrences—comprised of a total of three separate and distinct acts (penis in anus on one occasion, and both finger and penis in anus on a separate occasion)—took place between June 1, 2018, and May 31, 2019.

¶ 56    Given this testimony, there was "minimal differentiation between the counts at some point in the proceeding," (*id.* at 638) and we are not "unable to discern the evidence that supports each individual conviction" (*id.* at 637). Defendant should not be shielded from conviction because C.P. testified that the occurrences happened more than 50 times. If the State were to charge

defendant with additional offenses against C.P. in any hypothetical future prosecution based on the details of these already-adjudicated encounters, we are confident that he will be able to invoke the protection against double jeopardy. See *People v. Dzierzanowski*, 2023 IL App (2d) 210565-U, ¶¶ 114, 117.

¶ 57                                    III. CONCLUSION

¶ 58    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 59    Affirmed.