2024 IL App (1st) 230837-U

No. 1-23-0837

Order filed August 28, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| ANDREW SLABON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 OP 79622 |
| | ) | |
| PHILIP LADISA, | ) | Honorable |
| | ) | Sabra Lynne Ebersole, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices D.B. Walker and Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the denial of petitioner's amended petition for a stalking no contact order as the circuit court properly denied petitioner leave to present evidence that exceeded the subject matter of the petition.

¶ 2    Petitioner Andrew Slabon appeals the circuit court's order "terminat[ing]" his amended petition for a stalking no contact order against respondent Philip Ladisa pursuant to the Stalking No Contact Order Act (Act) (740 ILCS 21/1 *et seq.* (West 2020)) and dismissing the case. On

appeal, he asserts that the circuit court erred in denying him leave to present video surveillance footage he claimed would substantiate his claims against respondent. We affirm.

¶ 3    On November 30, 2021, petitioner filed a *pro se* petition for a stalking no contact order, with a handwritten four-page document containing allegations that respondent trespassed onto his property, verbally confronted him on one occasion, and regularly parked behind petitioner's residence. The circuit court denied the petition, and granted petitioner leave to amend.

¶ 4    On December 28, 2021, petitioner filed an amended emergency petition for a civil stalking no contact order (amended petition), including the same four-page handwritten document and two additional pages. In the handwritten document, he described events occurring in 2020 and 2021, stating he recently installed a CCTV system due to respondent's behavior.

¶ 5    Petitioner alleged that on December 1, 2020, he observed respondent and a young woman entering petitioner's backyard while petitioner was sleeping and shining flashlights into his kitchen and bedroom windows. On December 6, 2020, at 2 p.m., respondent entered the alley behind petitioner's home and initiated a "verbal confrontation" with petitioner. Respondent was yelling and screaming that he would " 'take care of [petitioner] for good,' " which caused petitioner to be in "reasonable apprehension of his safety" from that point forward. Petitioner alleged he had a partial video of this incident and would submit it as Exhibit A. Petitioner also alleged that he had since called the police about 20 times because respondent was illegally " '[d]ouble parking,' " but respondent would leave when the police arrived.

¶ 6    On October 1, 2021, petitioner observed respondent direct that a surveillance camera behind petitioner's home be pointed toward petitioner's bedroom window. On November 29, 2021, petitioner discovered that the camera was "nearly directly pointed" into his bedroom window and

could be seen from his window, which he stated was supported by Exhibit B of his amended petition. From January 1, 2020, to an unspecified date in 2021, petitioner's surveillance system captured respondent's vehicle illegally parked behind petitioner's residence while respondent remained in his vehicle. At several points, respondent "examine[d]" petitioner's home and property. Respondent would leave after about 10 minutes, return an hour later, and "repeat*** the process." Respondent's "excersize [*sic*] ha[d] increased dramatically in [the] recent year." Petitioner referenced Exhibit C, which included "video footage."

¶ 7    Petitioner also alleged that, on four occasions from November 30, 2021, to December 27, 2021, after he filed the initial petition, respondent was recorded attempting to contact him. About 5 or 10 minutes after petitioner exited his home, respondent would "[i]llegally double park" and stare or make eye contact without speaking, which was the "exact described behaviour" that prompted petitioner to file the petition. Petitioner "carefully stud[ied] Respondent['s] Recorded behaviour" with his security system and "discovered disturbing Recordings of Respondent adjusting, manouvering [*sic*] his recently installed, outdoor camera into Petitioners [*sic*] bedroom window" on several dates at about 2 a.m. Petitioner alleged that he "has these recordings" and wanted to present them "as Exhibits E, F, G, H, I, J, K."

¶ 8    The amended petition in the record only includes one attachment, a photocopy of a photograph labeled "Exhibit B." The copy is grainy and unclear, but appears to be a photograph of a rooftop. A white object on the roof is enlarged but unidentifiable. There are no other exhibits in the record on appeal.

¶ 9    From 2021 to 2023, the circuit court continued petitioner's amended petition.

¶ 10    On May 9, 2023, the circuit court conducted a hearing on petitioner's amended petition for a stalking no contact order. Petitioner appeared *pro se* and respondent through counsel.

¶ 11    Under examination by the court, petitioner testified that he knew respondent because respondent had inherited a property behind petitioner's home, where petitioner had lived for 30 years, and their properties share an alley.

¶ 12    Petitioner had a security system installed on his home because he lived in an area with a "relatively high risk" of crime. On December 1, 2020, the system alerted him to motion on his property. On his camera, he saw respondent enter his property through the rear gate shining a flashlight. On December 6, 2020, at about 2 p.m., while petitioner was repairing the roof of his garage, respondent exited his vehicle and confronted petitioner. Respondent made threats to petitioner, including that "he's got something for [petitioner]," would "take care of [petitioner] for good," and would make sure petitioner goes "back to jail." Petitioner feared for his safety, as he thought he would be arrested based on a "false claim."

¶ 13    The court asked petitioner if he had video evidence of the December 6 incident, and petitioner stated he did not "believe" he "included that" and did not "believe it would have any probative value at this point."

¶ 14    As to the October 1, 2021, incident, petitioner indicated that he "[p]artially" observed it with his own eyes. Petitioner saw a young man installing a wireless recording device. Respondent instructed the installer and indicated to "move it higher." Petitioner confirmed he did not speak to respondent after the camera was installed.

¶ 15    The court allowed petitioner to present the photograph of respondent's camera, which was attached to his petition  as "Exhibit B." Petitioner took the photograph from his bedroom window

on November 27, 2021, and explained that the fact the camera was visible from his bedroom window indicated his window was in the camera's view.

¶ 16    The court asked petitioner if he was requesting it to look at video footage in Exhibit C. Petitioner responded that it was "a very large amount of video," he was "focused at this point on efficiency," and "[w]e have not too much time." The court replied that it would give petitioner "the time [needed] to conduct a full and fair hearing" on his petition. The court explained that if petitioner had a video he wanted the court to look at, "the next step would be to mark it, [and] determine whether or not there's an objection, and whether or not [petitioner] can lay a foundation for the video." The court noted that petitioner claimed respondent was parking behind petitioner's home from "1/1/20 to '21," and asked if there was any video evidence of the allegation. Petitioner replied, "The videos I intend to present are not within this time frame."

¶ 17    The court asked petitioner about the allegation that respondent was "illegally double park[ing]" from November 30, 2021, to December 27, 2021. Petitioner stated he hoped to admit "a video of that incident." Petitioner confirmed that he had sent multiple exhibits to respondent's counsel. Respondent's counsel replied that he received "a large Google Drive with many videos, but none specifically marked as exhibits to his petition." The court allowed petitioner to identify the video exhibits he wanted it to view and informed petitioner it would "consider looking at any exhibits that correspond to [his] petition."

¶ 18    Petitioner then requested to amend his petition to include events up to "current." Respondent's counsel objected "to any amendments since the hearing has already started." The court sustained the objection. The court asked petitioner to focus on the proposed exhibits concerning the dates set forth in the petition and to show respondent's counsel the videos he wanted

the court to look at. Petitioner stated he did not have any video regarding the four separate occasions "between that date."

¶ 19     The court then returned to petitioner's allegations and asked how respondent's actions impacted him. Petitioner stated that if he hears "any noise," he jumps out of bed. He had nightmares of being stalked by a man and men "making sexual advances toward [him]." Petitioner "never had anything like that before this behavior started." He stated that "if you observe the videos, you'll see that this conduct is well outside what he tries to assert is maintenance on a property, routine check ups."

¶ 20     The court asked if petitioner had any exhibits that corresponded to his petition, and petitioner stated he had "plenty." Petitioner identified respondent's answer to an interrogatory as "Exhibit A," to which respondent's counsel raised no objection. As "Exhibit B," petitioner provided a list that he created of dates and times, which petitioner stated supported his claim of respondent making timely appearances in the alley.[1] Respondent's counsel objected to Exhibit B, stating the dates and times were outside the scope of the petition, and petitioner confirmed they were "outside the scope." The court sustained the objection.

¶ 21     Petitioner also identified a video dated March 26, 2022, that he wished to use as "Exhibit C." Respondent's counsel objected to the video, because it was outside the scope of the petition. The circuit court sustained the objection.

¶ 22     Petitioner stated that if the court was "going to deny [him] the entire opportunity to present new incidents that have occurred involving this petition," then the case could be "finalize[d] ***

---

[1] Petitioner labeled the list as "Exhibit B" for the purposes of the hearing. It is not the same as the "Exhibit B" photographic exhibit that petitioner had attached to his petition and discussed with the circuit court earlier in the hearing.

right here" because petitioner was not "going to be getting due process." The court explained to petitioner that it intended to conduct a hearing on the petition as filed, and there had been no motions to amend the petition since December 2021. It would not permit petitioner to amend his petition on the date of the hearing, nor would it take evidence on issues that had not been filed, explaining that respondent had not been given the opportunity to conduct discovery on incidents outside the amended petition. The court stated that it heard and denied petitioner's oral motion to amend the petition on the day of the hearing to take additional evidence about matters not in his written petition.

¶ 23    Petitioner stated that he did not have any further exhibits relating to his petition, but asserted that "it's ongoing" and respondent had been "making timely appearances within six minutes exactly on at least five separate occasions." He then submitted "Exhibit D," which was a "Google print out of Google maps of Respondent's home address" to explain the exact time of travel from respondent's home to petitioner's home. The court admitted the document over a relevance objection from respondent's counsel.

¶ 24    After testifying, the court allowed petitioner to make an offer of proof as to his video exhibits. Petitioner stated a video captured on May 6, 2023, showed respondent drive into the alley, stare at petitioner, smile, and then drive away as petitioner called the police. Respondent then drove back, parked, held his phone toward petitioner, and drove away again smiling. Respondent drove by a third time, parked "in front," walked through the alley, and stared at petitioner in a "very, very disturbing manner," which was something respondent had done in the past, but that day "was probably the most outrageous." Petitioner stated the video would show that he had "nothing towards" respondent and was "just sweeping the garbage up" in the alley and doing repairs.

¶ 25 The court asked if there was anything else petitioner wanted to tell the court that was inadmissible because it was outside the petition. Petitioner stated that respondent had been trying to intimidate him, making threatening gestures, "like smiling" at him, driving into the alley repeatedly, and circling the block "as if he had some kind of serious anger" toward him. Petitioner further stated that "all of the evidence I would have liked to submit***" showed that respondent was parking in his alley and observing him, which was "stalking" and "disturbing." Petitioner also had video evidence from a police officer's body camera, which would have shown respondent making false statements about him to police.

¶ 26 Respondent testified that the property near petitioner's residence had been in his family for the last 85 years, and he took ownership of it in 2011. He also managed the property and appeared there four or five times a day to address tenant complaints, make repairs, cut grass, shovel snow, and perform maintenance. Respondent "never *** set foot anywhere near [petitioner's] property." Respondent had a camera mounted on his garage pointing on a 45-degree angle and focused on his gate.

¶ 27 Respondent did not recall yelling and screaming at petitioner on December 6, 2020. He recalled being near his garage and helping fill a friend's tire with air when a "bag of fecal material" came from the direction of petitioner's backyard, nearly hitting his friend's head and hitting respondent's vehicle.

¶ 28 On cross-examination by petitioner *pro se*, respondent confirmed that the camera on his garage was wireless and rotating, and respondent could control it with his phone. He installed the camera after petitioner threw plastic bags over petitioner's garage, hit respondent's vehicle, and narrowly missed an occupant, and after petitioner filled respondent's garbage cans with water and

watched respondent attempt to empty them. Respondent explained that he needed proof because objects were "flying over" petitioner's garage and hitting respondent's property. Respondent confirmed that he went to the property four or five times a day because he felt petitioner was a threat, but respondent would "take care of [his] own business."

¶ 29    When asked about his parking, respondent stated he parked on his apron, and his "entire car fits on [his] apron." He testified that the police "told [him] to move it. That's all and [respondent] did." Respondent denied ever threatening petitioner or saying he would "take care of [petitioner] for good." He confirmed that, two days prior, he smiled and recorded petitioner with his camera because he "thought it was funny."

¶ 30    The circuit court "terminated" the amended petition and dismissed the case. It found petitioner had not met his burden to prove, by a preponderance of the evidence, that he was the victim of stalking as defined by the Act. The court noted that the testimony essentially centered on the location of respondent's camera and where it pointed, as well as on "[respondent] double parking in the back alley." The court found petitioner's testimony was not credible. It stated that, when offered the opportunity to admit exhibits corroborating his allegations, petitioner "declined to do that, [and] was not able to do it," other than with a photograph of respondent's camera.

¶ 31    The court found respondent's testimony more credible than petitioner's testimony "overall." Namely, respondent testified credibly that he had to go to his property across from petitioner's home to do maintenance, and "felt it was necessary to protect himself, his tenants, and his family to place the camera." The court also found the allegation that respondent came and went from his property from "January the 1st of 2020 to 2021," and sometimes looked at petitioner as

respondent came and went, was not stalking because respondent was "in a place where he ha[d] every right to be."

¶ 32    Petitioner filed a timely notice of appeal. This court entered an order taking petitioner's appeal on the record and his brief alone where respondent failed to file a brief on appeal within the time-period prescribed by Illinois Supreme Court Rule 343(a) (eff. July 1, 2008). See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (we may consider an appeal on the appellant's brief only where the record is simple and the claimed error can be easily decided without the aid of an appellee's brief).

¶ 33    On appeal, petitioner asks that we reverse the circuit court's order terminating his amended petition and dismissing the case because the circuit court erred in not permitting him to admit the video evidence of "occurences [*sic*] during the petition proceedings." He argues the video footage would have substantiated his "credibility that the respondent did make timely arrivals on the specified dates and times, clearly indicating respondent[']s monitoring of the petitioner's movements." Petitioner also claims that the circuit court was biased against him and improperly assisted respondent's counsel by deciding the basis for counsel's objections.

¶ 34    As an initial matter, points not argued in an opening brief are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Petitioner here challenges the circuit court's final order terminating his amended petition and dismissing his case. However, he does not develop any substantive argument addressing the court's finding that petitioner failed to prove that respondent's actions constitute stalking under the Act. Petitioner solely challenges the court's evidentiary rulings and its alleged bias against him. Accordingly, he has forfeited any challenge to the factual bases underlying the court's judgment. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 35    Further, we could strike petitioner's brief for his failure to comply with the majority of Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020), which provides procedural rules that govern the content of appellate briefs. *Pasic v. Department of Financial & Professional Regulation*, 2022 IL App (1st) 220076, ¶ 15. For example, in violation of Rule 341(h)(6), petitioner's statement of facts provides only limited citations to the record and contains impermissible argument and comment. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Similarly, in violation of Rule 341(h)(7), the argument section of petitioner's brief does not clearly identify or separate the issues being raised on appeal, nor does it consistently include "citation of the authorities and the pages of the record relied on." See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Nevertheless, we chose to consider the merits of petitioner's contentions.

¶ 36    The Act provides "a remedy for victims who have safety fears or emotional distress as a result of stalking." (Internal quotation marks omitted.) *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 10. Relief under the Act is available only to victims of stalking. 740 ILCS 21/15(1) (West 2020). The Illinois rules of civil procedure generally govern a proceeding to obtain a stalking no contact order. 740 ILCS 21/30(a) (West 2020). The party seeking a protective order bears the burden of proving by a preponderance of the evidence that the respondent's conduct constitutes stalking. *Id.* We will not reverse the circuit court's determination regarding whether a preponderance of the evidence shows a violation of the Act unless it is against the manifest weight of the evidence. *McNally*, 2015 IL App (1st) 134048, ¶ 12.

¶ 37    Here, however, petitioner does not challenge the circuit court's finding that he did not establish stalking by a preponderance of the evidence. He argues instead that the court erred in

denying him leave to submit evidence of respondent's actions that were not alleged in his petition. We find no error.

¶ 38    "In determining whether evidence is relevant, the trial court must consider the evidence in light of *the factual issues raised by the pleadings* and it is not error to exclude testimony which does not bear on the specific issues under consideration." (Emphasis added.) *Aguinaga v. City of Chicago*, 243 Ill. App. 3d 552, 567 (1993). At the time of the hearing, petitioner's amended petition set forth allegations regarding incidents on December 1, 2020, December 6, 2020, and October 1, 2021, as well as patterns of behavior from January 1, 2020, to an unspecified date in 2021 and from November 30, 2021, to December 27, 2021. However, during the hearing, petitioner attempted to raise for the first time allegations against respondent regarding incidents that occurred outside these dates and to submit surveillance videos in support of these "new incidents." None of these videos pertained to the incidents alleged in petitioner's amended petition. The court therefore properly sustained respondent's objection to the admission of video footage, as the proposed video evidence was not relevant to the pleadings that were the subject of the hearing. *Id.*

¶ 39    The court also did not abuse its discretion in denying petitioner's oral motion to amend his amended petition to include the dates on which the videos were captured. The circuit court has the discretion to permit amendments to pleadings "[a]t any time before final judgment *** on just and reasonable terms." 735 ILCS 5/2-616(a) (West 2020); *CIMCO Communications, Inc. v. National Fire Insurance Co. of Hartford*, 407 Ill. App. 3d 32, 38 (2011). In order to determine whether the circuit court abused that discretion, we consider: " '(1) whether the proposed amendment will cure the defective pleading; (2) whether the proposed amendment would surprise or prejudice the opposing party; (3) whether the proposed amendment was timely filed; and (4) whether the moving

party had previous opportunities to amend.' " *CIMCO Communications, Inc.*, 407 Ill. App. 3d at 38 (quoting *Board of Directors of Bloomfield Club Recreation Ass'n v. Hoffman Group, Inc.*, 186 Ill. 2d 419, 432 (1999)).

¶ 40    Here petitioner had ample opportunity to amend the amended petition during the almost 1½-year period between when he filed the amended petition and the court heard the petition, yet he did not make the request until during the hearing. The proposed amendment was not timely, and would have surprised and prejudiced respondent, who had no opportunity to conduct discovery on the new allegations of stalking or harassment. The court properly denied leave to amend the amended petition. See *id.*

¶ 41    Lastly, we reject petitioner's contention that the circuit court was biased against petitioner and improperly interfered in the hearing by objecting on behalf of respondent, providing respondent with legal advice and guidance regarding grounds for objections. It is not improper to "sustain an objection on a valid basis, even if the basis is different from that offered by the objecting attorney." *People v. Avendano*, 2023 IL App (2d) 220176, ¶ 80. In doing so, the circuit court does not abandon "its role as a neutral arbiter" or show "unfair favoritism" toward the objecting party. *Id.*

¶ 42    Further, the record does not support petitioner's assertion that the circuit court harbored prejudice against him as a *pro se* litigant lacking "substantial financial resources." This court has consistently held that *pro se* litigants are held to the same standards as licensed attorneys, and petitioner therefore was not entitled to favorable treatment simply because he was a *pro se* litigant. See *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 78. Moreover, the record establishes that the court treated petitioner in a respectful manner. The court gave petitioner ample time to make

his arguments. It carefully considered, and in some instances guided, petitioner's multiple requests to present supporting evidence of new allegations, and explained why it would not allow the evidence or leave to further amend the petition. The court ultimately denied the petition on the basis that petitioner simply failed to show by a preponderance of the evidence that respondent was engaged in stalking behavior. We find no evidence of bias here.

¶ 43    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 44    Affirmed.